Stephen Charles McArthur (Bar No. 277712)
stephen@smcarthurlaw.com
The McArthur Law Firm
11400 W. Olympic Blvd., Suite 200
Los Angeles, CA 90064
Telephone: (323) 639-4455
Facsimile: (855) 420-7032
Attorneys for Defendant and Counter-Plaintiff
PINES INTERNATIONAL, INC.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUJA LIFE, LLC, a Delaware Corp., | Case: 3:16-cv-00985-GPC-WVG |
| Plaintiff and Counter-Defendant | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| PINES INTERNATIONAL, INC., a Kansas corporation, | |
| Defendant and Counter-Plaintiff. | Hearing:  October 14, 2016<br>Time:      1:30pm<br>Place:  Courtroom 2D, 2nd Floor<br>Judge: Hon. Gonzalo P. Curiel |

Pursuant to Fed. R. Civ. P. 65, Plaintiff Pines International, Inc. ("Pines" or "Counter-Plaintiff") hereby moves the Court to issue a Preliminary Injunction enjoining Suja Life, LLC ("Counter-Defendant" or "Suja") from marketing, advertising, manufacturing, distributing, and selling any and all products that use the "Mighty Greens" trademark and any mark confusingly similar to it.

This motion is made on the grounds that Pines is likely to prevail on its trademark infringement claim against Counter-Defendant, that irreparable injury will result to Pines if relief is not granted, that the balance of the equities tips in Pines' favor, and that granting injunctive relief is in the public's interest.

1    Plaintiff Pines submits the following memorandum of points and authorities

2  in support of Pines' motion for a preliminary injunction.

3                                    Respectfully submitted,

4

5         By:    /s/ Stephen McArthur

6                Stephen Charles McArthur
                 The McArthur Law Firm
7                Attorneys for Counter-Plaintiff
                 PINES INTERNATIONAL, INC.
8                11400 W. Olympic Blvd., Suite 200
                 Los Angeles, CA 90064
9                (323) 639-4455

10

11  Dated:  August 8, 2016

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Table of Contents

**TABLE FOR AUTHORITIES** ................................................................................... iii

**I.    INTRODUCTION** ........................................................................................ 1

   A. Pines Was the First to Use the MIGHTY GREENS® Mark .......................... 1

   B. The Mighty Greens® Registered Trademark .............................................. 2

   C. Suja's Infringement of Mighty Greens® ................................................... 4

**II. ARGUMENT** ................................................................................................ 7

   **A.    Pines Has a Protectable Ownership Interest in Mighty Greens** ............. 9

   **B.    Suja's Use of Mighty Greens is Likely to Cause Consumer Confusion** .... 9

      1.    **Mighty Green® and Mighty Greens™ Are Identical** ..................... 11

      2.    **There is Marketing Channel Convergence Between the Two Marks** ... 13

      3.    **Mighty Greens® and Mighty Greens™ Identify Related Products** ... 19

      4.    **Mighty Greens® is at Least a Suggestive Mark** ......................... 21

      5.    **Consumers of Mighty Greens Are Not Likely to Use a High Degree Of Care, Which Will Lead to Confusion** ......................................... 23

      6.    **Suja Uses Mighty Greens™ With Full Knowledge of Pines' Rights** ... 24

      7.    **Evidence of Actual Consumer Confusion** ................................. 26

      8.    **Likelihood of Expansion of the Product Lines** ........................ 28

      9.    **A Balancing Of The Factors Finds a Likelihood of Confusion** ... 29

   **C.    Pines Will Suffer Irreparable Harm Without Preliminary Relief** ........ 29

   **D.    The Balance of Equities Tips in Pines' Favor** ............................... 33

   **E.    There is a Strong Public Interest in Granting Pines' Motion.** ......... 35

**III. CONCLUSION** ........................................................................................... 35

TABLE FOR AUTHORITIES

**Cases**

*Adidas Am., Inc.*, 2016 WL 591760, at *18 ..................................................... 25

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) .......... 7

*Am. Trucking Assns. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ...... 7

*Brookfield*, 174 F.3d at 1059.................................................. 10, 11, 19, 21, 25, 29

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, No. 115CV01656GEBEPG, 2016 WL 80632, at *3 (E.D. Cal. Jan. 7, 2016).................................... 7, 8, 9, 25, 30

*Cafe Found., Inc. v. Seeley*, No. 16-CV-00628-JST, 2016 WL 1258624, at *2 (N.D. Cal. Mar. 31, 2016) ...................................................................................... 7

*CytoSport, Inc. v. Vital Pharm.*, Inc., 617 F. Supp. 2d 1051, 1065 (E.D. Cal. 2009).... 7, 8, 11, 13, 21, 22, 23, 26, 29, 30, 35

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) ............... 10, 25, 27

Herb Reed Enters. v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239 (9th Cir. 2013)............ 29

*Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 1165 (Fed.Cir.2002) ....................... 11

*Kohler v. Baldwin Hardware Corp.*, 82 USPQ2d 1100 (TTAB 2007) ..................... 9

*KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir.2005) ... 9

*K-Swiss, Inc. v. USA AISIQI Soes Inc.,* 291 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003) 7, 11, 24, 25

*La Quinta Worldwide, LLC, v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876-77 (9th Cir. 2014) ... 13

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) ............................................................................................................... 8, 19, 28

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987) ........................... 13

Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3rd Cir. 1990) ........... 29

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1128 (9th Cir. 2014) .................... 12, 22, 23, 27

*Starbucks Corp. v. Heller*, No. CV 14-01383 MMM MRWX, 2014 WL 6685662, at *5 (C.D. Cal. Nov. 26, 2014) ............................................................................................................. 34

*SunEarth Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012) .. 7, 8, 10, 11, 13, 19, 25, 29

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000) ...................................... 9

*Warner Bros. Entm't v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG CWX, 2012 WL 6951315, at *4-5 (C.D. Cal. Dec. 10, 2012) ........................................................................................ 10

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014) ........... 7

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) .................................................. 7

**Statutes**

15 U.S.C. § 1114 ................................................................................................................................ 8

15 U.S.C. §§ 1057(b) ........................................................................................................................ 9

Fed. R. Civ. P. 65 ............................................................................................................................... i

Federal Rule of Civil Procedure 65(a) ......................................................................................... 35

# I.      INTRODUCTION

For more than twenty years, Pines has sold a nutritional superfood powder meant to be mixed with water and consumed as a beverage named Mighty Greens®. Pines owns a federal trademark registration for Mighty Greens® and has acquired extensive trademark rights and goodwill throughout the United States.

Suja, without authorization from Pines, distributes and sells a nutritional juice beverage that it calls Mighty Greens™. Since Suja was purchased by Coca-Cola Company and Goldman Sachs in mid-2015, it has dramatically ramped up its production and distribution of products bearing the Mighty Greens™ mark, destroying the goodwill Pines has diligently built up in its registered trademark.

The public is likely to be confused and assume a connection between Mighty Greens® and Mighty Greens™. The Court should enter a preliminary injunction to protect Pines' goodwill and reputation and to stop consumer confusion in the marketplace.

## A. Pines Was the First to Use the MIGHTY GREENS® Mark

Pines offers a wide variety of nutritional supplements sold online and through numerous grocery and natural food retail stores across the United States. (See attached Declaration of Ron Seibold ("Seibold Decl.") ¶ 3). Pines incorporated in 1976 and was a pioneer of the popular nutritional superfood movement in the United States. (Id. ¶ 2) Pines prides itself for its reputation for having the highest

quality natural goods on the market and for its well-known place in the modern history of natural foods creation and distribution in the United States. (Id.)

Since at least January 1, 1996, Pines has sold one of its signature nutritional supplements in interstate commerce under the brand name Mighty Greens®. (Id.) Mighty Greens® is a nutrient-dense powder blend of organic wheatgrass, organic alfalfa, and other superfoods. (See Exhibit A to McArthur Decl. in support of Pines' Answer and Counterclaims, Dkt. 13 (hereinafter "McArthur Decl."), photograph of Mighty Greens® product and label, attached hereto as **Exhibit A**). The sole suggested use on the Mighty Greens® label is to stir it into water or juice in order to drink it in liquid form. (Id.) Pines' sales of Mighty Greens® total about $9.5 million to date. (Seibold Decl., ¶ 29).

**B. The Mighty Greens® Registered Trademark**

On September 23, 1997, Pines was granted U.S. Trademark Registration Number 2,100,194 for Mighty Greens. (See McArthur Decl., Exhibit B, attached hereto as **Exhibit B**). Mighty Greens® has achieved incontestability status under the Lanham Act because it has been registered to Pines and continuously used by Pines for over five consecutive years. (See McArthur Decl., Exhibits C, D, and E, attached hereto as **Exhibits C, D, and E D** respectively.).  The certificate of registration and active status are prima facie evidence of Pines' ownership of the registration, validity thereof, and Pines' exclusive right to use Mighty Greens®. Pines has used Mighty Greens® for an extensive amount of time, expending

substantial amounts of time and money to build its distinctive Mighty Greens® brand in association with its nutrient dense health food products. (Seibold Decl., ¶¶ 5-8). As such, the primary significance of the Mighty Greens® serves to identify Pines as the source of the goods bearing the mark. Until Suja's infringing use in July 2014, Pines was the one and only company using Mighty Greens for any product in the organic, natural foods, beverage, and/or supplement space.

Every year for the past twenty years, Pines has spent average over $700,000 per year on maintaining, marketing, and promoting its brand and small number of products, including Mighty Greens®. (Seibold Decl., ¶ 17). Pines has also spent countless invaluable sweat hours promoting and marketing Mighty Greens®. (Id.) For example, over the past two years, Pines has spent more than $100,000 on social networking and Google advertisements alone for its products, which strongly emphasize its Mighty Greens® brand. About half of those expenses have been solely for Mighty Greens®. (Id.)

Pines is the registered owner of the domain name www.mightygreens.com, which is a link that directs users to Pines' main operating website where Mighty Greens® can be purchased.  (Id.) Pines' ownership of www.mightygreens.com is just one example of many of Pines' efforts to connect its incontestable trademark with its Mighty Greens® products and Pines corporate brand name.

By virtue of nearly twenty years of extensive sales, advertising, and promotion, Mighty Greens® has acquired extensive common law trademark rights,

goodwill, acquired distinctiveness, and secondary meaning throughout the United States.  For purchasers, potential purchasers, distributors, and members of the general public, Mighty Greens® symbolizes Pines and the affection, favorable recognition, and substantial goodwill associated with Pines.

### C. Suja's Infringement of Mighty Greens®

Suja has manufactured, distributed, offered for sale, and sold a nutritional juice product branded as Mighty Greens™ since at least July 1, 2014.

Both Mighty Greens® and Mighty Greens™ are nearly identical in use and function. As both Mighty Greens' advertisements and promotional material describe, their primary function is to provide the consumer with a dense serving of nutrients through oral consumption of the products in liquid form. The sole difference in the use of Mighty Greens® and Mighty Greens™ is that Pines' product is intended to be mixed with a liquid prior to consumption, while Suja's product comes prepared in liquid form.

Suja has even told its customers online that its Mighty Greens product "is 98% juice. The remaining 2% is a proprietary blend of tea and superfood powders". (emphasis added) (See McArthur Decl., Exhibit F, attached hereto as **Exhibit F**). Pines also promotes its legitimate Mighty Greens® product as a "superfood" and a "powder" and that it should be consumed as a beverage. (See Exhibit A).

Pines' label describes rehydrating the dried powder to make a juice that looks almost identical to the counterfeit product Suja sells. (See Exhibit A).  Both Mighty

4

Greens Products are promoted as "nutrient dense" mixtures containing alfalfa grass and other healthy plant material. (See Exhibit A); (See also, McArthur Decl., Exhibit G, a screencapture of Suja's website describing its mighty greens juice product as "nutrient dense", attached hereto as **Exhibit G**).  Both Mighty Greens Products are prominently advertised as "Certified Organic". (Id.) Both Mighty Greens Products promote themselves as vegan, nutritious, dairy-free, and gluten-free. Both Mighty Greens Products are prominently advertised as "non-GMO". (Id.)

Pines is the first Non-GMO project verified whole food alfalfa grower that sells to other manufacturers for human consumption. (Seibold Decl., ¶ 13).  Pines knows of no other Non-GMO project verified whole food alfalfa grower that sells whole food alfalfa for human consumption. (Id.) Suja claims that its identical mighty greens product contains Non-GMO project verified whole food alfalfa. Thus, the alfalfa in Mighty Greens™ may actually be grown by Pines and may be the same alfalfa that is used in Pines' Mighty Greens® product.

The notions of consuming a nutrient-dense drink and living a healthy lifestyle are foundations of both Pines and Suja's advertisements and brand identities. (See, e.g., McArthur Decl., Exhibits H and I, screencaptures of Both Mighty Greens Products marketing material on Instagram describing their respective products as foundational to a healthy lifestyle, attached hereto as **Exhibits H and I**); (see also, Seibold Decl. ¶ 14).

5

Both Mighty Greens Products are sold to the same type of purchasers: consumers of nutrient-dense health and nutrition drinks.  The sole suggested use for Pines' "Mighty Greens" product since the first day of its release in 1996 has been to mix it with water and drink. (See McArthur Decl., Exhibit J, Mighty Greens label from the 1990s directing customers to "take one level tablespoon daily with water or juice", attached hereto as **Exhibit J**); see also (Seibold Decl., ¶ 9); see also *below*.



Pines holds extensive common law trademark rights to Mighty Greens® used as a beverage since the sole suggested use for its product for the past twenty years has been to drink it in liquid form. Additionally, since Suja's infringing product is a juice, Pines' Mighty Greens® can be mixed with it per the suggested use above.

## II. ARGUMENT

In order for a party to be granted a preliminary injunction, a plaintiff must demonstrate: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction." *Cafe Found., Inc. v. Seeley*, No. 16-CV-00628-JST, 2016 WL 1258624, at *2 (N.D. Cal. Mar. 31, 2016) ; *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014), *as amended* (Mar. 11, 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Am. Trucking Assns. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit employs a "sliding scale" under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Courts regularly grant a preliminary injunction where, as here, plaintiff owns a federally registered mark and defendant is using a substantially similar mark for similar goods. *See, e.g., Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, No. 115CV01656GEBEPG, 2016 WL 80632, at *3 (E.D. Cal. Jan. 7, 2016); *CytoSport, Inc. v. Vital Pharm.*, Inc., 617 F. Supp. 2d 1051, 1065 (E.D. Cal. 2009) aff'd, 348 Fed. Appx. 288 (9th Cir. 2009); *SunEarth Inc. v. Sun Earth Solar Power Co.*, 846 F.

Supp. 2d 1063, 1078 (N.D. Cal. 2012); *K-Swiss, Inc. v. USA AISIQI Soes Inc.,* 291 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003). As shown below, Pines has met each of the four factors necessary for a preliminary injunction.

To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, "a party must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1144 (9th Cir. 2011).

This facts of this case are most like the facts in the *CytoSport* and *Brooklyn Brewery* cases. *CytoSport, Inc.,* 617 F. Supp. 2d 1051 (9th Cir. 2009) (because the products, "Muscle Milk" and "Muscle Power", promote themselves similarly and make the same general type of health claims, a likelihood of confusion was strong); *Brooklyn Brewery Corp.,* 2016 WL 80632 (E.D. Cal. Jan. 7, 2016) (preliminary injunction granted against Black Ops Brewing Co. for infringing "Black Ops" beer trademark because allowing defendant to use the mark would cause plaintiff to lose control of its reputation, goodwill, thus causing irreparable harm).

This case also shares some similarities to *Sun-Earth*, where a preliminary injunction was granted even where the goods sold under the marks had entirely different functions. See *SunEarth Inc. v. Sun Earth Solar Power Co.,* 846 F.Supp.2d 1063, 1078 (N.D. Cal. 2012) (trademark infringement found and preliminary injunction granted where plaintiff sold thermal collectors that transformed heat into

8

liquid, and defendant sold photovoltaic cells that converted energy from the sun into electricity). When the trademarks are identical, as they are here, "then the degree of similarity between the parties' goods or services can be quite large and there will still be a likelihood of confusion." See *Kohler v. Baldwin Hardware Corp*., 82 USPQ2d 1100 (TTAB 2007) (finding a likelihood of confusion when identical marks were used on senior user's toilets and junior user's door locks).

### A. Pines Has a Protectable Ownership Interest in Mighty Greens

Pines received a U.S. Trademark Registration for Mighty Greens® in 1997. (See Exhibit B.) For twenty years, Pines has actively, continuously, and prominently used the Mighty Greens® mark in interstate commerce in association with its nutrient-dense wellness product. Any registered mark in continuous use for five years is considered incontestable. 15 U.S.C. § 1057(b); *Wal–Mart Stores, Inc. v. Samara Bros., Inc*., 529 U.S. 205, 209 (2000). Incontestable registration status is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the registration." *Brooklyn Brewery Corp*, 2016 WL 80632, at *3.

### B. Suja's Use of Mighty Greens is Likely to Cause Consumer Confusion

"Likelihood of confusion exists when consumers viewing the mark would probably assume that the goods it represents are associated with the source of a

9

different product identified by a similar mark." *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc*., 408 F.3d 596, 608 (9th Cir. 2005). Consumer confusion is the "sine qua non of trademark infringement," and requires courts to ask, "[w]hether the similarity of the marks is likely to confuse customers about the source of the products." *Warner Bros. Entm't v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG CWX, 2012 WL 6951315, at *4-5 (C.D. Cal. Dec. 10, 2012), aff'd sub nom. *Warner Bros. Entm't v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013); *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1205 (9th Cir. 2000).

In answering this question, the Ninth Circuit uses the eight-factor *Sleekcraft* test to help guide the determination of a likelihood of confusion. The factors are: (1) similarity of the protected mark and the allegedly infringing mark; (2) marketing channel convergence; (3) relatedness of the goods; (4) strength of the protected mark; (5) the degree of consumer care; (6) defendant's intent in using the allegedly infringing mark; (7) evidence of actual consumer confusion; and (8) likelihood of product expansion.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

Although there are eight factors not all of the factors are of equal importance or applicable in every case. *See SunEarth, Inc. v. Sun Earth Solar Power Co.,* 846 F. Supp. 2d 1063, 1076 (N.D. Cal. 2012). Specifically, the Ninth Circuit has stated that the three factors most probative of confusion are the similarity of the marks, the marketing channels used, and the relatedness of the goods. *See GoTo.com, Inc. v.*

10

*Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir.2000) (stating that those there are the "controlling troika" of the *Sleekcraft* analysis); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999).

### 1.  Mighty Green® and Mighty Greens™ Are Identical

In analyzing this factor, "[t]he marks must be considered in their entirety in terms of appearance, sound, and meaning, and as they appear in the marketplace, with similarities weighed more heavily than differences." *Brookfield,* 174 F.3d at 1059. "[L]ess similarity between the marks will suffice when the goods are complementary, . . . the products are sold to the same class of purchasers, ... or the goods are similar in use and function." *SunEarth, Inc*, 846 F. Supp. 2d at 1077. Furthermore, where marks are virtually identical, "if they were used with identical products or services likelihood of confusion would follow as a matter of course." *K-Swiss, Inc. v. USA AISIQI Soes Inc.,* 291 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003). Finally, the most important aspect of the marks to examine is the words themselves. See *Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 1165 (Fed.Cir.2002).

In *CytoSport*, the Ninth Circuit affirmed a preliminary injunction in favor of "Muscle Milk" against "Muscle Power". *CytoSport, Inc*., 617 F. Supp. 2d at 1066-68. The court found that even though different words were used in each mark, the similarities were "significant" and that they had "similar commercial connotations." (Id.) Even though there were divergences between the two marks, the "minor differences were 'trivial distinctions' . . . when viewing the products in full, as they

appear in the marketplace." *CytoSport, Inc.*, 617 F. Supp. 2d at 1066-68. Thus, the court found that this factor weighed heavily in favor of plaintiff and affirmed the injunction.

Likewise, in *POM*, the court granted a summary judgment for trademark infringement even when the products the marks were used on were not identical. PUR Pŏm was an energy drink and POM was a fruit juice. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1128 (9th Cir. 2014). Even though the term "PUR Pŏm" was not identical to "POM", and one was an energy drink while the other a fruit juice, that did not create a "triable issue of fact" as to similarity of the marks or relatedness of the two goods. (Id).

The *POM* case stressed that similarities should be evaluated more heavily than differences. (Id.) Even though there were some visual dissimilarities in the two marks, the sound and meaning of the marks were identical which led the court to acknowledge that while "balancing the marks' many visual similarities, perfect aural similarity, and perfect semantic similarity more heavily than the marks' visual dissimilarities. . . the similarity factor weighs heavily in POM Wonderful's favor." (Id.) The court issued summary judgment on behalf of plaintiff POM finding trademark infringement where only "five of the eight [*Sleekcraft*] factors weigh in [Pom's] favor". *Pom Wonderful LLC*, 775 F.3d.

The Mighty Greens® and Mighty Greens™ marks are alphanumerically identical. Even as displayed on the products themselves, they are confusingly

similar. They both consist solely of the words MIGHTY and GREENS spelled out entirely on a green background surrounded by claims as to their nutrition and health food status when consumed. The two marks are also phonetically identical as there has been no alteration to either of the words. Both suggest an organic mixture of powerful, healthy, nutritious ingredients, leaving the same commercial impression on the consumer. Accordingly, the two Mighty Greens marks are highly similar in sound, appearance, meaning, and overall commercial impression. This factor weighs strongly for Pines.

### 2.  There is Marketing Channel Convergence Between the Two Marks.

"Convergent marketing channels increase the likelihood of confusion." *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987).When analyzing this factor, courts "consider where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts." *La Quinta Worldwide, LLC, v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876-77 (9th Cir. 2014).

In *SunEarth*, the court found confusion from using the same marketing channels since both the plaintiff and defendant targeted a niche market by attending several of the same trade conventions. *SunEarth, Inc.,* 846 F. Supp. 2d at 1079. Analogously, confusion was found to be likely in *CytoSport*, since the products were sold through "nearly identical retail outlets, using substantially the same

methods", and were competing "for exactly the same customers." *CytoSport, Inc,*
617 F. Supp. 2d at 1069.

Here, Suja and Pines sell their Mighty Greens products at the same grocery retailers
and advertise side-by-side online and on social media. Suja distributes and sells
beverages prominently displaying the Identical Mark at hundreds of physical retail
locations throughout the United States. Many of those are the exact same natural
food grocers that Mighty Greens® is sold in, such as Mother's Market and Sprouts.
(Seibold Decl. ¶ 15). For example, the Mother's Markets located at 151 E Memory
Ln, Santa Ana, CA 92705 and 5759 E Santa Ana Canyon Rd, Anaheim, CA 92807
sell both Mighty Greens products in the same store. (See Bubenheim Decl. in
Support of Answer and Counterclaims, Dkt. 13 (hereinafter, "Bubenheim Decl.")
Exhibits K, L, M, N, O, and P, attached hereto as **Exhibits K, L, M, N, O, and P**,
photographs of Mighty Greens products in same stores.).

Online, a simple Google search for "Mighty Greens" puts Suja's and Pines'
Mighty Greens products side-by-side with each other. (See McArthur Decl., Exhibit
Q, organic Google search for "Mighty Greens" with cleared browser history.) And
on websites like Amazon, both Mighty Greens products are shown side-by-side
when searching for "Mighty Greens" and are both placed under the same category
of "Grocery & Gourmet Food".

Whether searching on Instagram, Facebook, Pinterest, or Amazon, both
Mighty Greens Products and their respective marks are frequently encountered at

14

the same time and on the same screen. For example, searching "Mighty Greens" on Instagram pulls up hundreds of photos of green liquid in a glass, and it is often impossible to tell which is Suja's and which is Pines'. Once Mighty Greens® is mixed with water and poured into a glass as directed, the two products are virtually indistinguishable. (See, e.g., McArthur Decl., **Exhibits R, S, T, U, V, W, X, Y, and Z**, screencaptures of various Mighty Greens products uploaded by consumers on Instagram).

Both Mighty Greens products are promoted and marketed heavily on the same social media platforms using the exact same hashtag of #MightyGreens. The critical importance of marketing and promoting products to millennials on social media cannot be underestimated. Exhibits R, S, and T, are copied below, respectively, and show an Instagram image of Pines' legitimate Mighty Greens product above two Instagram images of Suja's Identical Mark and product.



1





If the consumers did not explicitly add a #suja hashtag to the second two photographs above, Exhibits T and U, then they would be virtually

16

indistinguishable to the average consumer on social media from Pines' legitimate Mighty Greens products.

There are even photographs on social media of customers mixing Mighty Greens™ with other superfoods powders. (See McArthur Decl., Ex. A1, screencapture of Instagram showing a user of Mighty Greens™ mixing it with a nutrition powder supplement, attached hereto as **Exhibit A1**). That customers are mixing Mighty Greens™ with superfoods powder blends further conflates the confusion between both Mighty Greens products, which can be mixed together.

Both Suja and Pines attend and promote their products at the exact same industry trade shows. For example, both Suja and Pines attend the Natural Products Expos East and West. (See http://www.sujajuice.com/blog/suja-goes-to-the-natural-products-expo-west/). Both Suja and Pines are featured in the same trade industry publications. As one example, Suja is seen here page 24 of the April 2016 edition of *Vitamin Retailer*, which Pines is frequently featured in and advertises in: http://go.epublish4me.com/ebook/ebook?id=10088194#/24

Further, a search for the term "Mighty Greens" in the search box of www.facebook.com brings up both products adjacent to each other. The screencapture below shows Mighty Greens® on top in beverage form instructing the consumer to consume it in a glass of water or in juice. The Mighty Greens™ beverage below it looks nearly identical to the beverage in the Mighty Greens® photo above and uses the same trademark.

17





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Ninth Circuit has repeatedly recognized that "[c]onvergent marketing channels increase the likelihood of confusion." *AMF, Inc.,* 599 F.2d at 353. Here, both Pines and Suja sell their products under the same roof at identical retail outlets, compete for nearly identical customers looking for organic, health conscious, superfood drinks, attend the same trade shows, and promote their products nearly identically with the same hashtags and similar images on social media and the internet. Therefore, this factor too weighs strongly in favor of Pines.

**3.  Mighty Greens® and Mighty Greens™ Identify Related Products**

Marks are related when they are used to offer similar products to a similar group of consumers. *Brookfield,* 174 F.3d at 1056. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." (Id. at 1055); *Network Automation, Inc*., 638 F.3d at 1150. "The danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists."  *SunEarth, Inc*. 846 F. Supp. 2d at 1077. The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. (Id.)

The court in *SunEarth, Inc*. held that relatedness is not read narrowly. *SunEarth, Inc*., 846 F. Supp. 2d at 1077. In *SunEarth*, even though the products in question provided entirely different functions, the fact that some customers may choose between the two types of products to lower their energy bills with solar

technology was enough to make the products related. (Id.) Here, there is no meaningful distinction between Mighty Greens® and Mighty Greens™. Both Mighty Greens products are promoted as "nutrient dense" mixtures containing alfalfa grass and other healthy plant material. (*See* Exhibit G, a screen capture of Suja's website describing its mighty greens juice product as "nutrient dense"). It is clear that Pines and Suja are targeting the same types of consumers since both Mighty Greens products are prominently advertised as "Certified Organic," vegan, nutritious, dairy-free, gluten-free, and as "non-GMO." (See Exhibits A, G).

Consuming a nutrient-dense drink and living a healthy lifestyle are foundations of both Pines and Suja's advertisements and brand identities. (*See, e.g*., Exhibits H and I).The two goods are targeted toward the same class of purchasers: consumers of health and nutrition beverages.

Furthermore, the fact that Mighty Greens® comes in powder form and suggests to the consumer to add water before consuming, while Mighty Greens™ does not need added water is a distinction without a difference. Folgers® may sell instant coffee powder mix, but consumers still closely relate it to an actual cup of coffee such that if someone else sold Folders™ ready-to-drink coffee, there would be confusion. Just as powdered coffee and coffee are closely related, or just as powdered Kool-Aid® mix is closely related to flavored sugar water, so is Mighty Greens® closely related to the beverage that its label instructs to make with it.

Finally, the more similar the marks are, the less related the goods need to be for there to be a chance of mistaken consumer association. Here, the Mighty Greens trademarks are identical, so the court must only find a low degree of relatedness for this factor to weigh in favor of Pines.

Accordingly, all three of the controlling troika of the *Sleekcraft* factors weigh in favor of Pines. This is enough to find that Pines has a strong likelihood of success on the merits even without analyzing the remaining five factors.

### 4.  Mighty Greens® is at Least a Suggestive Mark

Suggestive marks suggest characteristics of the underlying goods that require an effort of the imagination by the consumer to ascertain the type of product. *See CytoSport, Inc.*, 617 F. Supp. 2d at 1070 ("If a consumer must use more than a small amount of imagination to make the association, the mark is suggestive and not descriptive.")

Commercial strength is based on actual marketplace recognition, including advertising expenditures. *Boldface Licensing + Branding v. By Lee Tillett, Inc*., 940 F. Supp. 2d 1178, 1189 (C.D. Cal. 2013). "Advertising expenditures can transform a [weak] mark into a strong mark … [when] a mark has achieved actual marketplace recognition." *Brookfield*, 174 F.3d at 1058. "The more extensively advertised and readily identifiable a mark and dress are in the relevant market, the stronger the mark and dress." *CytoSport, Inc.*, 617 F. Supp. 2d at 1070.

Suggestive marks that have the requisite commercial strength are considered strong marks. In *CytoSport*, for example, the court found that the mark "Muscle Milk" was suggestive because it did not describe a quality or characteristic of the product. *CytoSport, Inc.*, 617 F. Supp. 2d at 1071. The court analyzed that the term "milk" went against the common association, and the term "muscle" is used so frequently by many different entities that a consumer would not automatically know that the product is a nutritional product. It concluded that the Muscle Milk mark "require[d] significant imagination on the part of the consumer to guess the underlying goods and services associated with the mark." (Id.)

Similarly, in *POM* the mark was considered strong because the word "POM" was "not ascribed independent pomegranate-related meaning by conventional dictionaries", therefore "customers [had] to use some additional imagination and perception to decipher the nature of Pom Wonderful's goods," making the mark suggestive. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014).

Likewise, Mighty Greens® is a suggestive mark that has achieved significant commercial strength. Analogous to the Muscle Milk and POM marks, Mighty Greens "suggests characteristics of the underlying goods and require[s] an effort of the imagination by the consumer to ascertain the type of product." *CytoSport, Inc.*, 617 F. Supp. 2d at 1071 (finding that Muscle Milk is "at least" a suggestive mark for a protein and workout beverage). Mighty Greens as a nutrient-dense powder blend of organic wheat grass, organic alfalfa, and other superfoods.

22

The words mighty and greens, like the word muscle, are frequently used in various connotations by numerous businesses so that a consumer would not unquestionably know that it was a health food product. It could, for example, be referencing a golf course, art store, environmental non-profit, or any other number of things.

Additionally, Pines has spent substantial time, money, and effort developing its distinctive Mighty Greens brand. For the past twenty years, Pines has spent on average over $700,000 annually marketing and advertising its small number of brands and products, including Mighty Greens. (Seibold Decl., ¶ 17.) Through the nearly twenty years of extensive sales, advertising, and promotion, Mighty Greens® has achieved sufficient marketplace recognition and together with its suggestive nature is a strong mark worthy of protection.

### 5.  Consumers of Mighty Greens Are Not Likely to Use a High Degree of Care, Which Will Lead to Confusion

"Where products are relatively inexpensive, there is a higher likelihood that consumers will be confused because they are likely to use less care while shopping." *CytoSport, Inc.,* 617 F. Supp. at 1076. Price and frequency of purchase influence a consumer's level of care in purchasing a product. Beverages sold at grocery stores, for example, are not given a high level of care. In both *CytoSport* and *POM,* the Ninth Circuit pointed out that when it came to inexpensive nutritional drinks sold in supermarkets, consumers are less likely to use particular care. (Id.); *Pom Wonderful LLC*, 775 F.3d at 1127; *see also CSC Brands LP v. Herdez Corp.,*

191 F. Supp. 2d 1145, 1153 (E.D. Cal. 2001) ("Given that these beverages are sold in supermarkets and are low cost, the degree of care likely to be exercised by purchasers is minimal.").  Mighty Greens™ costs about $7.50 to $14, while Mighty Greens® cost about $25 to $37.50.

Consumers who are looking for "nutrient dense" drinks and mixtures are going to purchase them frequently as they incorporate such beverages into their daily lives as part of a healthy lifestyle. Thus, it is unlikely for such consumers to exercise a high level of care. Furthermore, the price difference between Mighty Greens® and Mighty Greens™ does not alert buyers to a different source because it is typical for different forms of a product to vary in price. For instance, GNC's "Lean Shake" line of powder products costs around $30 whereas its same Lean Shake line of premade shakes only costs $8 for a four-pack. (*See* www.gnc.com).

Here, both Mighty Greens products are inexpensive grocery store beverages, so consumers are not likely to exercise a high degree of care and thus are more likely to be confused between the two identically named products.  *See K-Swiss, Inc. v. USA Aisiqi Shoes, Inc.,* 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (reasonable consumer unlikely to exercise high degree of care in selecting tennis shoes, which cost more than either Mighty Greens product at issue in this case).

### 6.  Suja Uses Mighty Greens™ With Full Knowledge of Pines' Rights

This factor favors the plaintiff where the alleged infringer used or adopted its mark with knowledge, actual or constructive, that it was another's trademark.

*Brookfield,* 174 F.3d at 1059. While an intent to confuse consumers is not required for a finding of trademark infringement (*GoTo.com, Inc*., 202 F.3d at 1208), intent to confuse has been inferred when a defendant has actual knowledge of the existence of plaintiff or where defendant continues using a mark after it became aware of the plaintiff's registered mark. See *Brooklyn Brewery Corp*., 2016 WL 80632, at *8; see also *SunEarth, Inc*, 846 F. Supp. 2d at 1080; *Adidas Am., Inc*., 2016 WL 591760, at *13; *K-Swiss, Inc*., 291 F. Supp. 2d at 1125.

Since 2013, Suja has filed at least forty federal trademark applications for its many juice products including Green Supreme, Lemon Love, Green Charge, Vanilla Chill, Berry Goodness, and many more. According to press releases, in August 2015, The Coca-Cola Company paid about $90 million for a nearly thirty percent stake in Suja, valuing Suja at about $300 million. Suja's revenue in 2014 was more than $40 million. Jeff Church, the co-founder of Suja, has called Suja's Mighty Greens juice "[o]ne of our best selling products."

Surely, Suja considers its Mighty Greens™ product a valuable brand worth protecting. Suja even puts a ™ symbol on it to demonstrate that it is using "Mighty Greens" as a trademark. (See Exhibit G). Despite it plethora of trademark registrations for its other juices, Suja never filed a trademark application for Mighty Greens, one of its "best selling products". The most reasonable inference here is that Suja did not apply for a trademark registration for this particular brand because it knew it would be rejected due to the existing Mighty Greens® registration.

25

On May 28, 2015, immediately after discovering Suja's use of the identical mark, Pines wrote a letter to Suja demanding that it cease infringing Pines' Mighty Greens® trademark rights. (See Letter from Pines to Suja, attached hereto as **Exhibit A2**). Over the course of the next year, numerous emails, letters, and phone calls were exchanged between the parties' counsel as the parties diligently attempted to resolve the matter.

Despite Suja being on notice of the Incontestable Mighty Greens® Trademark for at least a year to date, it has not curtailed its use of the identical mark. Instead, Suja has actually *increased* its use of the Mighty Greens brand, expanding to more and more stores and flooding the market. Even if Suja's mark was originally adopted in good faith, no good faith excuse could possibly exist after Suja received the 2015 cease and desist letter.

### 7. Evidence of Actual Consumer Confusion

A trademark holder does not need to show evidence of actual consumer confusion or survey evidence to prove "actual consumer confusion". In *CytoSport*, the court reiterated that a court can find actual consumer confusion based off of "inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace" alone. 617 F. Supp. 2d at 1074.

Not only do we submit that it is reasonable for the Court to make such an inference here, but Pines has been damaged by actual confusion in the marketplace as reflected in the sworn declaration of Pines Co-founder, Ron Seibold.  In March

26

2016, at the 2016 Natural Product Expo West (which Suja <u>sponsored</u> this year), a representative from The Kroger Company, one of the largest supermarket chains in the world, came to the Pines' booth.  (Seibold Decl., ¶¶ 33-34). The Kroger representative mentioned Mighty Greens® and asked Mr. Seibold if Pines was owned by Suja. (Id.) Mr. Seibold made a pitch to the Kroger representative to carry Mighty Greens in Kroger stores. (Id.) His response was that *Kroger already carries Mighty Greens® in liquid form from Suja* and that Kroger did not want to carry a different version of it made by a different company. (Id., emphasis added.) The Kroger representative discouraged Mr. Seibold from pitching Mighty Greens® to any other Kroger buyers because he felt it would be too confusing with two different companies having the same brand name for very similar products.

As a distribution and retail outlet customer, the Kroger representative demonstrates actual consumer confusion. However, even if the court does not find any actual customer confusion here, the lack of actual confusion is not considered to be an important *Sleekcraft* factor. "While '[e]vidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely,' the converse is not true." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000). In other words, the absence of evidence demonstrating actual confusion does not defeat a finding as to likelihood of confusion—especially where the remaining factors weigh in the plaintiff's favor. *Pom Wonderful LLC*,

775 F.3d (likelihood of confusion found at the preliminary injunction stage even where POM showed no evidence of actual consumer confusion).

### 8.   Likelihood of Expansion of the Product Lines

A trademark owner is afforded "greater protection against competing goods, [therefore a] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Network Automation, Inc.,* 638 F.3d at 1153. When goods are closely related, "any expansion is likely to result in direct competition." (Id.).

In *Warner Bros. Entm't* this factor was unimportant because "the parties [were] already marketing products in the same field." *Warner Bros. Entm't,* 2012 WL 6951315, at *14 (C.D. Cal. Dec. 10, 2012). Even though the markets did not directly overlap since defendant's movies went directly to DVD instead of theatrical release the court still found them to be in direct competition. (Id.) Similarly, here Pines and Suja are already directly competing in the health food drink market despite one being already in liquid form. However, even if Pines and Suja are not directly competing now, it is entirely logical that Pines would expand into ready-to-consume beverages. Indeed, many companies sell both a powder and a liquid form of their beverage, including the GNC Lean Shake line of products and numerous others including Skinny Girl, Isogenix, Protein Plus, Slim Fast, and Special K.

As a result, this factor is unimportant as Pines and Suja are already direct competitors, or it weighs in favor of Pines since Suja's use is infringing due to the likelihood of Pines' expansion into the pre-prepared liquid drink market.

### 9.  A Balancing Of the Factors Finds a Likelihood of Confusion

For the reasons discussed above, and in the *CytoSport, K-Swiss, SunEarth,* and *Pom* cases, the majority of factors weigh in favor of a finding of likelihood of confusion and no factor weighs against such a conclusion. Moreover, the finding is particularly strong on the three factors that courts have found to be the most important: similarity of the marks, relatedness of the goods, and use of similar marketing channels. *See GoTo.com,* 202 F.3d at 1205; *Brookfield,* 174 F .3d at 1054. Thus, it is not only "probable" that Pines will prevail on its trademark infringement claims, but it is almost a certainty.

### C. Pines Will Suffer Irreparable Harm Without Preliminary Relief

To be entitled to injunctive relief, a plaintiff "must establish irreparable harm." *Herb Reed Enters. v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013). In trademark cases, "courts have found irreparable harm in the loss of control of a business' reputation, a loss of trade and loss of goodwill." *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 195 (3rd Cir. 1990).

Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners, therefore "a trademark owner's loss of the ability to control its marks, creates the potential for damage to its reputation."

29

*CytoSport, Inc., 617 F. Supp. 2d at 1080.* In *CytoSport*, irreparable harm was found where, like here with Mighty Greens, the junior user was flooding the marketplace with its infringing product and advertising, causing the trademark owner to lose control of its reputation, market, and goodwill in its brand. *617 F. Supp. 2d at 1079.*

In *Brooklyn v. Black Ops Brewery*, the court found irreparable harm and granted a preliminary injunction where, like here with Mighty Greens, it was established from plaintiff's declarations alone that plaintiff was facing a loss of control of reputation, loss of trade, and loss of goodwill of its Black Ops trademark. *Brooklyn Brewery Corp,* 2016 WL 80632 at 21. In *Brooklyn*, the plaintiff was planning a strategic and long-anticipated launch of its entire beer portfolio, including its "Black Ops" beer, in California. However, the defendant's infringing trademark robbed the plaintiff of control over the reputation of the beer sold under the "Black Ops" mark which the plaintiff had spent eight years building. (Id.)

Stating the standard laid out in *Herb Reed*, the court said that the plaintiff provided evidence that demonstrated "that Defendant's use of the [Black Ops] marks will cause Plaintiff to lose its ability to control its brand reputation and goodwill, since what could be perceived by consumers as the quality of Plaintiff's product risks no longer being within Plaintiff's control." Similarly, here with Mighty Greens, Counter-Plaintiff Pines is "losing control" of its trademark and the brand because consumers will associate the quality of Suja's (or, even worse, Coca-Cola's) product with Pines. Additionally, the *Brooklyn* court accepted evidence that

plaintiff would lose its ability to market its product in California, which is also similar here as it is impossible for Pines to market its product with Suja's infringement because Suja is flooding the marketing channels that Pines wants to use.

In most trademark infringement cases, the senior user naturally has market power and hold over the junior user, limiting both the junior user's entrance into the market and the damage that can be done to the senior user. Here, however, the junior user, Suja, recently sold 49% of its company to Coca-Cola and Goldman Sachs, two of the richest corporations in the world. By its own words, it is "leverage[ing] [Coke's] distribution network and . . . expand[ing] [Suja's] production." (http://www.sujajuice.com/faq/.)

Pines cannot compete with Suja and Coca-Cola. (Seibold Decl., ¶ 35). Not only is Suja in the same grocery stores as Pines (Mother's Market and Sprouts, for example), but Suja is also in Wal-Mart, Target, Kroger, Safeway and every other grocer that Pines is actively trying to put its own Mighty Greens® product in. (Seibold Decl., ¶ 32). As demonstrated by the co-founder of Pines' discussion with a Kroger representative (Seibold Decl., ¶¶ 33-34), Suja's leveraging of its marketing channels is directly blocking Pines from entering those same stores.

As further shown by the social media screencaptures of #MightyGreens where Suja's beverages now dominate Pines' beverages, Pines is losing all control over the reputation of its product sold under the Mighty Greens® mark. Essentially

all searches for Mighty Greens on Google, social media, and retail sites like Amazon now point to Suja's nutritional beverage product, not to Pines'. Pines' sales of Mighty Greens® has already dropped by a staggering 40% from 2014 to 2015 despite its increase in advertising expenditures. (See Seibold Decl., ¶ 30). The sharp downward trend has continued through 2016. (Id.) The falloff in Pines' Mighty Greens® sales has coincided with Suja's "leverage[ing] [Coke's] distribution network and . . . expand[ing] [Suja's] production."

Pines has spent twenty years and a substantial amount of money building and cultivating its goodwill in the registered trademark. If Suja is not stopped, then in another year or two, Suja will have 99.9% of the Mighty Greens market and no consumer will ever associate Mighty Greens with Pines again. Pines will have no goodwill left in its Mighty Greens® mark. Suja's use of the Identical Mark is diminishing and undermining Pine' legitimate association with the Mighty Greens® brand.

Furthermore, Suja's association with Coca-Cola could have a devastating affect on Pines' reputation. Coca-Cola stands for everything Pines is against.

Pines' corporate ethos is a commitment to the planet, organic farming, sustainable agriculture, environmental preservation, and non-GMO natural superfoods. Pines' express corporate mission is to use its profits to advance sustainable farming and land use. (https://wheatgrass.com/essential_grid/an-earth-day-blog-about-what-pines-does-for-the-planet/). Pines has converted thousands of

acres of chemically farmed land to certified organic. (Id.) Pines is against

pesticides, chemicals, and GMOs. Everything Pines produces is 100% organic and

sustainable. (https://wheatgrass.com/essential_grid/pines-is-committed-to-100-

sustainability/). Pines is also one of the few natural food companies to take a strong

stand against plastic: all Mighty Greens® products are packed in glass jars instead

of plastic. Pines regularly donates superfoods to the malnourished all over the

world. (https://wheatgrass.com/essential_grid/pines-international-donates-

superfood-pellets-to-undernourished/). In 2014, Pines was named the Humanitarian

Company of the Year by The Children's Feeding Network.

(https://wheatgrass.com/essential_grid/pines-is-humanitarian-company-of-the-

year/). The co-founders of Pines served on the committees that established organic

standards both in Kansas and throughout the United States.

The Coca-Cola Company, meanwhile, embodies the high-fructose corn

syrup, non-organic, non-sustainable, GMO, plastic using American food culture that

Pines has devoted forty years to combatting. The is nothing more damaging to the

mission or the goodwill of Pines than Coca-Cola and Goldman Sachs-owned Suja

using Pines' intellectual property to profit, advance their agenda, and intermingle

Pines' name with theirs.

### D. The Balance of Equities Tips in Pines' Favor

Courts must "balance the competing claims of injury and must consider the

effect on each party of the granting or withholding of the requested relief." *Winter*,

129 S.Ct. at 376. Courts routinely disregard the defendant's "hardship" when the only harm they will suffer if an injunction is entered is that they will be unable to continue to profit from infringing the marks. *Starbucks Corp. v. Heller*, No. CV 14-01383 MMM MRWX, 2014 WL 6685662, at *5 (C.D. Cal. Nov. 26, 2014).

When balancing, the equities courts do not allow defendants a free-ride off a plaintiff's efforts. In *Adidas,* that the defendant would suffer harm, both economic and reputational, was not given any weight because it had the notice to desist from its infringing activities. *Adidas Am., Inc*., 2016 WL 591760, at *18

An examination of the relevant facts here shows the equities tips in favor of granting Pines' requested preliminary injunction. Pines is a smaller company that is losing its reputation and goodwill while having its registered trademark drowned out by an infringing mark. Additionally, enjoining Suja from using the Might Greens mark would not substantially burden or cause injury to Suja for three reasons. First, Suja has dozens of other products that its company sells. (See http://www.sujajuice.com/products/.) Second, Suja can continue to sell its underlying juice under a different brand name. Third, valued at over $300 million, Suja is much better economically equipped than Pines to rebrand and pay for new advertisements and marketing.

Any harm suffered by Suja will result from being enjoined from engaging in unlawful trademark infringement. See *Triad Sys. Corp. v. Southeastern Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1994) (Defendant "cannot complain of the harm

that will befall it when properly forced to desist from its infringing activities.")
Accordingly, the balance of the equities tips heavily in favor of Pines.

### E.  There is a Strong Public Interest in Granting Pines' Motion.

In the trademark context, the public interest at stake is the right of the public
not to be deceived or confused. *CytoSport, Inc*., 617 F.Supp.2d at 1081. In *Brooklyn
Brewery*, the court found that the public interest automatically weighed in favor of
issuing a preliminary injunction when the trademark owner has demonstrated a
likelihood of confusion. (*Brooklyn*, at 23). The public interest favors an injunction
to prevent likely confusion of consumer products where the trademarks, products,
and channels are so similar. Accordingly, public interest is best served here by
stopping such deception and confusion.

### III. CONCLUSION

For the reasons set forth above, Counter-Plaintiff Pines respectfully
requests that this Court grant Pines' Motion for Preliminary Injunction
pursuant to Federal Rule of Civil Procedure 65(a).

Respectfully submitted,

Dated:  August 8, 2016          By:*/s/ Stephen McArthur*
                                Stephen Charles McArthur
                                The McArthur Law Firm
                                Attorneys for PINES INTERNATIONAL

1

## CERTIFICATE OF SERVICE

2     I hereby certify that on August 8, 2016, I electronically filed the following

3  documents with the Clerk of the Court for the United States District Court,

4  Southern District of California by using the CM/ECF system:

5

6     1. COUNTER-PLAINTIFF'S MOTION FOR PRELIMINARY
         INJUNCTION;
7     2. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
         OF MOTION FOR PRELIMINARY INJUNCTION

8

9     The following counsel will be served by the CM/ECF system,

10  electronic mail, and first class mail:

11         William P. Cole (wcole@calljensen.com)
12         Matthew R. Orr (morr@calljensen.com)
           CALL & JENSEN
13         610 Newport Center Drive, Suite 700
14         Newport Beach, CA 92660
           Attorneys for Suja Life, LLC
15

16

17   DATED: August 8, 2016              THE MCARTHUR LAW FIRM, P.C.

18

19

20                           By: _/s/ Stephen McArthur_
                                STEPHEN MCARTHUR
21                              Attorneys for Counter-Plaintiff

22

23

24

25

26

27

28