William P. Cole, Bar No. 186772
  wcole@calljensen.com
Matthew R. Orr, Bar No. 211097
  morr@calljensen.com
Samuel G. Brooks, Bar No. 272107
  sbrooks@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:   (949) 717-3000
Fax:   (949) 717-3100

Attorneys for Plaintiff Suja Life, LLC

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUJA LIFE, LLC, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PINES INTERNATIONAL, INC., a Kansas corporation,<br><br>Defendant. | Case No.  3:16-cv-00985 GPC WVG<br><br>**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   October 14, 2016<br>Time:  1:30 p.m.<br>Place:  Courtroom 2D |
| PINES INTERNATIONAL, INC., a Kansas corporation,<br><br>Counter-Plaintiff,<br><br>vs.<br><br>SUJA LIFE, LLC, a Delaware corporation,<br><br>Counter-Defendant. | Complaint Filed:   April 22, 2016<br>Trial Date:         None Set |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ....................................................................................1

II.  FACTS ...................................................................................................1

III. LEGAL STANDARD .............................................................................4

IV.  DISCUSSION .........................................................................................5

A.   Pines Offered No Evidence of Irreparable Harm ..........................5

    1.   Pines Unreasonably Delayed Bringing This Motion ...........5

    2.   Pines Offers No Evidence of Harm—Irreparable or
         Otherwise ...........................................................................6

B.   Pines Has Not Established That It Is Likely to Prevail on the
     Merits .........................................................................................10

    1.   Survey Evidence Establishes that Consumers are not
         Confused ...........................................................................11

    2.   "Mighty Greens" Is a Weak Descriptive Mark ..................12

    3.   Pines and Suja Compete In Different Market
         Segments ...........................................................................15

    4.   Consumers of Pines and Suja Products Are Likely to
         Exercise Great Care ...........................................................16

    5.   Both Pines and Suja's Labels Clearly Identify the
         Source ...............................................................................17

    6.   Suja's Intent Was Innocent ...............................................20

    7.   Pines Is Not Likely to Expand Into the Juice Market .........21

    8.   Overlap in Marketing Channels Is Minimal .......................22

C.   The Harm to Suja If An Injunction Issues in Error Far
     Outweighs Any Risk of Harm to Pines .......................................23

D.   The Public Interest Favors Denial of a Preliminary
     Injunction ..................................................................................24

V.   CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

<u>Page</u>

## FEDERAL CASES

*Active Sports Lifestyle USA, LLC v. Old Navy, LLC*,

    No. SACV 12-572 JVS (Ex), 2014 WL 1246497 (C.D. Cal. March 21, 2014) ........... 5

*Advertise.com, Inc. v. AOL Advertising, Inc.*,

    616 F.3d 974 (9th Cir. 2010) ..................................................................... 12

*Alliance for the Wild Rockies v. Cottrell*,

    632 F.3d 1127 (9th Cir. 2011) ..................................................................... 4

*Am. Trucking Ass'n, Inc. v. City of L.A.*,

    559 F.3d 1046 (9th Cir. 2009) ..................................................................... 5

*AMF Inc. v. Sleekcraft Boats*,

    599 F.2d 341 (9th Cir. 1979) .......................................................... 11, 12, 17

*Brookfield Communications*,

    174 F.3d 1036 (9th Cir. 1999) ................................................... 15, 17, 20

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*,

    156 F. Supp. 3d 1173 (E.D. Cal. 2016) ..................................................... 10

*Cairns v. Franklin Mint Co.*,

    24 F.Suppc.2d 1013 (C.D. Cal. 1998) ..................................................... 11

*CytoSport, Inc. v. Vital Pharm., Inc.*,

    617 F. Supp. 2d 1051 (E.D. Cal. 2009) ..................................................... 10

**TABLE OF AUTHORITIES (cont'd)**

Page

*Dish Network Corp. v. FCC,*

   653 F.3d 771 (9th Cir.2011)........................................................................4

*Hanginout, Inc. v. Google, Inc.,*

   54 F.Supp.3d 1109 (S.D. Cal. 2014).................................................5, 6, 8

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.,*

   736 F.3d 1239 (9th Cir. 2013) .................................................5, 8, 9, 10

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*

   49 F.3d 1551 (Fed. Cir. 1995).....................................................................6

*Icebreaker Ltd. v. Gilmar S.P.A.,*

   911 F.Supp.2d 1099 (D. Ore. 2012).........................................................15

*Monster, Inc. v. Dolby Laboratories Licensing Corp.,*

   920 F.Supp.2d 1066 (N.D. Cal. 2013) .....................................................11

*Moose Creek, Inc. v. Abercrombie & Fitch Co.,*

   331 F.Supp.2d 1214 (C.D. Cal. 2004) ......................................................15

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.,*

   638 F.3d 1137 (9th Cir. 2011) ..................................................................11

*Nutrition 21 v. U.S.,*

   930 F.2d 867 (Fed. Cir. 1991)......................................................................6

*Opticians Ass'n of Am. v. Indep. Opticians of Am.,*

   920 F.2d 187 (3d Cir. 1990)..........................................................................6

CALL&
JENSEN

- iii -
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES (cont'd)

Page

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,

    86 F.Supp.2d 305 (2000) .......................................................................... 14

*Safeworks, LLC v. Teupen America, LLC*,

    717 F.Supp.2d 1181 (W.D. Wash. 2010) .................................................. 15

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,

    846 F.Supp.2d 1063 (N.D. Cal. 2012) ...................................................... 15

*VMR Products, LLC v. V2H ApS*,

    No. 13-CV-7719-CBM-JEMx, 2016 WL 1177834 (C.D. Cal. Mar. 18, 2016) ......... 15

*Winter v. Natural Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) .............................................................................. 4, 5, 23

## FEDERAL STATUTES

15 U.S.C. § 1052(f) ........................................................................................ 21

## FEDERAL RULES

Fed. R. Civ. P. 65(c) ...................................................................................... 23

## OTHER AUTORITY

The New Oxford American Dictionary 745 (Elizabeth J. Jewell & Frank Abate eds.

    2001) .................................................................................................. 2, 12

## I. INTRODUCTION

After waiting more than a year, and only after Suja itself filed an action for declaratory judgment, Defendant/Counter-Plaintiff Pines International, Inc. ("Pines") requests that the Court impose an injunction prior to trial. The evidence Pines submitted in support of its motion, however, falls far short of the standard for the Court to award such extraordinary relief. Putting aside the merits of the case, Pines has offered no evidence whatsoever to establish that it has suffered irreparable harm, or that it is likely to suffer such harm if a preliminary injunction does not issue. The Court may deny Pines' motion on this basis alone.

To the extent the Court considers the merits at all, Pines has not established that it is likely to prevail in proving that Plaintiff/Counter-Defendant Suja Life, LLC's ("Suja") conduct is likely to cause confusion among consumers. On the other hand, Suja submitted survey evidence—which courts recognize as "often the most persuasive" evidence—demonstrating that consumers are <u>not</u> confused. The other factors relating to entry of a preliminary injunction also favor denial of the motion. The equities weigh heavily against entering a preliminary injunction because of the high risk of damage to Suja, and the public interest does not favor a preliminary injunction.

## II. FACTS

Suja is a seller of organic, non-GMO, cold pressed juices. [Declaration of Heather Thomaselli-Baker ("Thomaselli-Baker Dec.") ¶ 2]. Suja has a large variety of products consisting of different juice blends, such as Sweet Beets, Lemon Love, Mango Magic, and many more. [Thomaselli-Baker Dec. ¶ 2]. One of Suja's products is its "Mighty Greens" juice, which is a blend of organic apple, celery, cucumber, kale, collard greens, lemon, spinach, and ginger juices, with organic peppermint and spearmint teas, and organic spirulina, chlorella, barley grass, and alfalfa. [Thomaselli-Baker Dec. ¶ 2]. Suja has offered "Mighty Greens" juice for sale since July of 2014. [Thomaselli-Baker Dec. ¶ 3].

Suja adopted the trademark "Mighty Greens" because the juice is made using particularly nutritious (i.e., "mighty") green vegetables. [Thomaselli-Baker Dec. ¶ 4]. The dictionary definition of the word "greens" is "green leafy vegetables: *salad greens | collard greens*." The New Oxford American Dictionary 745 (Elizabeth J. Jewell & Frank Abate eds. 2001). With respect to Suja's "Mighty Greens," the term "greens" refers to the vegetable juices included in the blend, including celery, kale, collard greens, spinach, barley grass, and alfalfa.[1] [Thomaselli-Baker Dec. ¶ 4]. The adjective, "mighty," modifies the noun, "greens"—it means "possessing great and impressive power or strength." *Id.* at 1082. Thus, "Mighty Greens" communicates to the consumer that Suja's juice contains green vegetables that possess great and impressive power or strength—that is, that these greens are particularly nutritious. [Thomaselli-Baker Dec. ¶ 4].

Before adopting the "Mighty Greens" name for its juice, Suja performed a trademark search to confirm that it was not already being used by a competing beverage company. [Thomaselli-Baker Dec. ¶ 5]. Through its search, Suja discovered a number of registered trademarks, including registrations for environmentally-safe cleaning preparations ("Mighty Green," No. 4703281), lawn care ("Mighty Green Lawn Care," Nos. 4244754, 4240860), wallets ("mighty thin mighty strong mighty green, No. 4079685), fertilizers ("All South Mighty Green," No. 2818734 (cancelled)), pre-cut, fresh vegetables for salads ("Baby Veg Little and Mighty Greens," No. 2181526 (cancelled)); vegetable based nutritional supplement consisting primarily of dried or extracted plant material ("Mighty Greens," No. 2100194), and commercial food processors ("Mighty Green," No. 1869236 (cancelled)). [Thomaselli-Baker Dec. ¶ 5]. Because none of these registrations were in a category for juices or other beverages, Suja concluded that the trademark was available for use. [Thomaselli-Baker Dec. ¶ 6]. Suja did not at that time perform further investigation into each registered trademark,

---

[1] The blend also includes chlorella and spirulina, which are nutritional green algaes that are considered by many to be superfoods.

and was not aware that Pines' product was a blend of wheatgrass, alfalfa leaf, hemp protein, and stevia. [Thomaselli-Baker Dec. ¶ 6].

After its launch, Suja began selling "Mighty Greens" to Kroger, which is a major grocery store chain. [Thomaselli-Baker Dec. ¶ 8]. Suja also succeeded in placing the product with Costco, which resulted in "Mighty Greens" becoming Suja's highest volume product. [Thomaselli-Baker Dec. ¶ 8]. Nearly 75% of the revenue from Mighty Greens comes from sales to Costco.[2] [Thomaselli-Baker Dec. ¶ 8]. Since launching "Mighty Greens," Suja has invested significantly in building the goodwill for this juice through a variety of advertising and promotional strategies. [Thomaselli-Baker Dec. ¶ 10]. Suja has not at any point in time attempted to benefit from any goodwill developed by Pines. [Thomaselli-Baker Dec. ¶ 10].

Founded in the 1970's, Pines grows organic wheatgrass and other cereal grasses, which it dehydrates and sells in tablet and powder form. [Declaration of Matthew R. Orr ("Orr Dec.") Exh. 1, Seibold Depo 21:2-22:24]. According to Pines, it first created a product called "Mighty Greens" in 1995. [Orr Dec. Exh. 1, Seibold Depo 71:21-23]. However, for many years it sold mainly direct to end consumers. [Orr Dec. Exh. 1, Seibold Depo 71:24-73:6]. Pines did not begin pushing to sell its "Mighty Greens" product to distributors until after it hired a new sales manager in 2013. [Orr Dec. Exh. 1, Seibold Depo 71:24-73:6]. Even then, sales of Mighty Greens were relatively small. While Pines' CEO, Ron Seibold, estimated that sales of Pines "Mighty Greens" quadrupled from 2013 to 2014, [Orr Dec. Exh. 1, Seibold Depo 118:21-119:8], the actual increase was actually much more modest—only 30%—and the total of units sold was not significantly different from previous years. [Orr Dec. Exh. 2]. While sales of Pines Mighty Greens fell by 40% from 2014 to 2015, such a drop was not unusual; sales had similarly dropped by 41% both in 2000 and 2005. [Orr Dec. Exh. 2].

---

[2] Excluding sales to Costco, the performance of "Mighty Greens" is comparable to other popular flavors, including Sweet Beets, Mango Magic, and Green Delight. [Thomaselli-Baker Dec. ¶ 8].

In May 2015, Pines International, Inc. ("Pines") sent a letter to Suja claiming that it owns the exclusive rights to the "Mighty Greens" mark, and demanding that Suja cease and desist from using the mark on its juice products. [Thomaselli-Baker Dec. ¶ 11]. Suja promptly responded to the demand by letter from its attorney dated June 4, 2015. [Thomaselli-Baker Dec. ¶ 12]. Suja rejected Pines' claims, but proposed that the parties explore a mutually acceptable resolution that would preserve each party's rights. [Thomaselli-Baker Dec. ¶ 13]. Suja also offered to adopt a variation of the "Mighty Greens" trademark, but Pines rejected the offer. [Thomaselli-Baker Dec. ¶ 13].

After nearly a year of receiving threats from Pines, Suja eventually decided to have the issues judicially determined once and for all. [Thomaselli-Baker Dec. ¶ 14]. In April 2016, Suja filed and promptly served a complaint for declaratory relief. Suja granted Pines two extensions of time to respond to the complaint—a total of five weeks—to explore resolution of the matter. However, settlement discussions broke down when Pines demanded not only that Suja cease using the "Mighty Greens" name on its juice, but also pay Pines an exorbitant amount of money. [Thomaselli-Baker Dec. ¶ 14]. Pines finally filed its answer and counterclaim on June 24, 2016. After waiting another two weeks, Pines filed a motion for preliminary injunction.

## III.   LEGAL STANDARD

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22, and the moving party bears the burden of meeting all four *Winter* prongs. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *Dish Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir.2011). In particular, irreparable harm cannot be presumed, but instead must be

CALL&
JENSEN

clearly established by affirmative evidence. *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). "The mere possibility that a plaintiff will suffer irreparable injury is insufficient." *Hanginout, Inc. v. Google, Inc.*, 54 F.Supp.3d 1109, 1118 (S.D. Cal. 2014); *see also Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (cases suggesting lesser standard are not controlling or viable following *Winter*).

## IV.   DISCUSSION

### A.   Pines Offered No Evidence of Irreparable Harm

The most glaring omission in Pines' motion for preliminary injunction is the complete lack of any evidence of irreparable harm. While Pines pays lip service to *Herb Reed Enterprises*' requirement that it establish irreparable harm, its motion is supported only by "platitudes rather than evidence." *Herb Reed*, 736 F.3d at 1250. The motion falls far short of making a "clear showing" that Pines is entitled to extraordinary relief. *Winter*, 555 U.S. at 22. The burden of proving irreparable harm cannot simply be glossed over as Pines would have the Court do. Indeed, when evidence of irreparable harm is insufficient, the court may deny injunctive relief even when infringement has been conclusively established, the infringer has not ceased its infringing activity, and the infringement "is almost certain to continue." *See Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, No. SACV 12-572 JVS (Ex), 2014 WL 1246497, at *2-*3 (C.D. Cal. March 21, 2014). Evidence of irreparable harm must be even clearer and more convincing when a party seeks to restrict the other party's rights before the matter can be fully adjudicated.

### 1.   Pines Unreasonably Delayed Bringing This Motion

Pines claims that it will suffer irreparable harm if it does not receive preliminary relief, but it makes no effort to explain why it allowed fourteen months to pass before filing its motion. Pines' CEO, Ron Seibold, knew about Suja's use of the name Mighty Greens on its juice as early as May 3, 2015. [Orr Dec. Exh. 5]. But Pines did not file its

motion until July 9, 2016.[3] Courts have recognized that "delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995); *see also Nutrition 21 v. U.S.*, 930 F.2d 867, 872 (Fed. Cir. 1991) ("delay "suggests that the *status quo* does not irreparably damage Nutrition 21"); *Hanginout, Inc. v. Google, Inc.*, 54 F.Supp.3d 1109, 1132 (seven month unexcused delay weighed against finding of irreparable harm).

Pines knew early on that Suja disputed its claims. If it truly believed that continuation of the *status quo* was likely to cause irreparable harm, it could have—and should have—filed suit and brought the instant motion immediately. Pines' unexplained delay proves that there is no urgency, and no threat of irreparable harm.

### 2. Pines Offers No Evidence of Harm—Irreparable or Otherwise

Pines argues that irreparable harm may be found in the "loss of control of a business' reputation, a loss of trade and loss of goodwill." [ECF No. 37, Motion at 29:21-29:23, *quoting Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990). While that type of harm might support an injunction if proved, Pines has not offered any evidence demonstrating such a loss.

Ron Seibold claims that sales of Mighty Greens dropped from 2014 to 2015 [ECF No. 37-1, Seibold Declaration ¶ 30], but without offering any business records to corroborate this testimony. More importantly, there is no evidence to establish that the decrease in sales is attributable to conduct by Suja. Pines only produced its historical sales data for Mighty Greens after Mr. Seibold's deposition, and these records show that

---

[3] The parties agreed to a two-week delay to explore the possibility of settlement. [Orr Dec. ¶¶ 2-3]. Specifically, on June 8, 2016, in furtherance of settlement discussions, Suja's counsel agreed not to argue delay as a defense for the time period from that date until the settlement discussions either bore fruit or failed. [Orr Dec ¶¶ 2-3]. The settlement discussions were unsuccessful, and Pines filed its answer and counterclaim on June 24, 2016. This short, two-week period does not absolve Pines of the otherwise lengthy delay.

CALL& JENSEN

sales of Mighty Greens have varied widely from year to year ever since it was first introduced, and the drop in sales in 2015 was not unusual. [Orr Dec. Exh. 2].

Pines appears to argue that an inference of causation can be inferred because the decrease in sales from 2014 to 2015 "coincided with" the introduction of Suja's Mighty Greens product, [ECF No. 37, Motion at 32]. But Pines admits that it only suspects the drop in sales is attributable to Suja, and it has not performed any market research to confirm its suspicions. [Orr Dec. Exh. 3, Response to RFA No. 6]. Moreover, Pines' records show that Mighty Greens' sales have dropped more than 40% from the previous year on two other occasions—in 2000 and 2005—long before Suja began selling its Mighty Greens product. [Orr Dec. Exh. 2]. Pines has seen wild year-over-year swings in sales relating to its Mighty Greens product over the past twenty years, both positive and negative.[4] In the five years immediately preceding Suja's use of the Mighty Greens trademark, sales of Mighty Greens fluctuated up and down each year: 19% increase from 2009-10; 26% drop from 2010-11; 15% increase from 2011-12; 24% drop from 2012-13; and 30% increase from 2013-14. [Orr Dec. Exh. 2]. If this evidence reveals any pattern, a drop in sales from 2014 to 2015 should have been expected—not a surprise.

There are many possible explanations for volatility in Pines' sales. For example, it may be a consequence of intense competition in the market for green superfood supplements. At his deposition Ron Seibold complained that natural products trade shows have become so crowded with competitors that it hardly makes sense for Pines to even attend them anymore. [Orr Dec. Exh. 1, Seibold Depo 42:10-43:9]. And the shelves of natural food stores are packed with "green superfood" supplements. [Brooks Dec. ¶¶ 2-3, Exhs. 1-10, 15]. Given these circumstances, it is no surprise that Pines'

---

[4] For example, Pines sales increased 40% from 1998 to 1999, only to drop by 41% the following year. [Orr Dec. Exh. 2] Sales then dropped consistently until 2003. Sales spiked from 2003 to 2004 by 54%, then dropped by 41% in 2005, then spiked by 149% in 2006. [Orr Dec. Exh. 2].

CALL & JENSEN

1    sales are inconsistent from year to year. In short, the evidence does not support a causal

2    connection between Suja's sales and a one-year drop in Pines' sales.

3         Pines argues that it is "'losing control' of its trademark and the brand because

4    consumers will associate the quality of Suja's (or, even worse, Coca-Cola's) product

5    with Pines." [ECF No. 37, Motion at 30:25-30:27]. But Pines has not offered any

6    evidence that consumers are actually associating Suja products with Pines. On the

7    contrary, survey evidence reveals that customers do not associate the products at all.

8    [Expert Report of Hal Poret ("Poret Report") at 43-47].

9         Pines' argument is based not on evidence, but rather on the premise that the Court

10   may assume irreparable harm if it proves confusion is likely. But that premise has been

11   roundly rejected. *See Herb Reed*, 736 F.3d at 1249 ("[A]ctual irreparable harm must be

12   demonstrated."); *id.* at 1250 ("Gone are the days when '[o]nce the plaintiff in an

13   infringement action has established a likelihood of confusion, it is ordinarily presumed

14   that the plaintiff will suffer irreparable harm if injunctive relief does not issue.'"). As

15   one court put it, "[a]llegations that the plaintiff has invested resources in developing its

16   brand and that the alleged infringing conduct is denying the plaintiff the benefit of its

17   investment is [sic] insufficient." *Hanginout, Inc. v. Google, Inc.*, 54 F.Supp.3d 1109,

18   1133 (S.D. Cal. 2014). In order to "demonstrate" that it has actually lost control of its

19   reputation, Pines must offer some evidence that consumers actually associate Suja or

20   Coca-Cola products with Pines. Pines has not done so.

21        Pines argues that Suja is "flooding the marketing channels that Pines wants to

22   use." But Pines did not offer any evidence of its efforts to actually use channels that

23   Suja has allegedly flooded. In fact, while Pines has been in business for the last forty

24   years, and has been marketing its "Mighty Greens" nutritional supplement for the last

25   twenty, it admits that it never sold <u>any</u> of its products to major grocery store chains or

26   mass markets. [Orr Dec. Exh. 3, Response to RFA Nos. 16-25]. Almost all of Pines'

27   sales are to distributors. [Orr Dec. Exh. 1, Seibold Depo 31:11-17]. Yet Pines' CEO

28

CALL &
JENSEN

received no reports from any distributors that Suja prevented them from placing Pines' Mighty Greens in grocery stores. [Orr Dec. Exh. 1, Seibold Depo 127:13-128:10].

The only "evidence" Pines offers is unreliable hearsay. Ron Seibold claims that an unidentified Kroger representative rejected his pitch because "they already carry it [Mighty Greens] in liquid form from Suja and would not want to carry a different version of it from a different company." At his deposition, Mr. Seibold admitted that he did not know this person's name, and that nobody could confirm the discussion even took place. [Orr Dec. Exh. 1, Seibold Depo 123:10-23]. While evidence does not have to be strictly admissible to be considered in preliminary injunction proceedings, *see Herb Reed*, 736 F.3d at 1250 n.5, the Court cannot award the extraordinary remedy of a preliminary injunction based on evidence that is so clearly unreliable. Mr. Seibold's hearsay testimony is insufficient to establish irreparable harm.

Pines argues—without reference to any evidence—that it is suffering harm because "essentially all" internet and social media searches for "Mighty Greens" point to Suja's product, rather than Pines'. [ECF No. 37, Motion at 31-32]. It predicts that within a year or two, "Suja will have 99.9% of the Mighty Greens market and no consumer will ever associate Mighty Greens with Pines again." [ECF No. 37, Motion at 32]. And Pines argues that Suja's association with Coca-Cola "could" harm its reputation because Coke "stands for everything Pines is against." [ECF No. 37, Motion at 32]. None of these assertions is supported by evidence. And even if they were, they would not prove that Pines has lost control of its reputation—that is, that consumers actually associate Suja's products with Pines or vice versa. Rather, such evidence would prove only that Suja's Mighty Greens juice is popular, and that Pines' Mighty Greens protein powder is not.

Rather than offering evidence, Pines merely cites to other cases where an injunction was granted. However, those cases involved very different facts, and the evidence submitted in connection with them is not before this court. As the Ninth Circuit has explained, "citation to a different case with a different record does not meet

CALL &
JENSEN

the standard of showing 'likely' irreparable harm." *Herb Reed Enterprises, LLC*, 736 F.3d at 1250.

Furthermore, the cases Plaintiff cites in support of its argument of irreparable harm—*CytoSport, Inc. v. Vital Pharmaceuticals, Inc.* and *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*—are inapposite. In *CytoSport*, the "products offered under the respective marks [Muscle Milk and Muscle Power] are identical, substitute products." *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1076 (E.D. Cal. 2009). Likewise, in *Brooklyn*, both parties used the "Black Ops" mark as the name for their beer, and the Patent and Trademark Office rejected the junior user's application to register its mark because "the parties' goods are identical (both beer)." *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1176 (E.D. Cal. 2016). Unlike *CytoSport* and *Brooklyn*, Suja's product is not a substitute for Plaintiff's nutritional supplement, but is instead a refrigerated ready-to-drink fruit and vegetable juice. Even if these cases were on point, the evidence offered to prove harm in those cases cannot substitute for evidence of irreparable harm in this case.

In short, the record contains no evidence that Pines has suffered any harm, or that it is likely to suffer irreparable harm if a preliminary injunction does not issue. Even if it had submitted evidence that it may suffer harm if Suja continues to sell its Mighty Greens product while the case is pending, it has not offered any evidence establishing that legal remedies would be insufficient to cure such harm (i.e., that the harm is irreparable). Because irreparable harm is a necessary element, the Court can and should deny the motion for preliminary injunction on this basis alone.

## B. Pines Has Not Established That It Is Likely to Prevail on the Merits

The Court need not decide whether Pines or Suja is likely to prevail on the merits because, as explained above, Pines has not offered any evidence to prove that it will suffer irreparable harm. Nevertheless, the evidence does not establish that Pines is likely to prevail. Rather, the evidence supports a finding that consumer confusion is unlikely.

CALL & JENSEN

In deciding whether either party is likely to prevail on the merits, the Court must consider whether consumers are likely to be confused if both Suja and Pines are permitted to use the "Mighty Greens" trademark in connection with their products. *See, e.g.*, *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). In conducting this inquiry, Courts often consider the "*Sleekcraft* factors*,*" named for the case in which they were articulated, *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). While these factors are often useful, they are not exhaustive, and they are to be applied adaptably—not as a "rote checklist." *Network Automation*, 638 F.3d at 1145. In each case the finder of fact must consider all of the facts and circumstances and make a decision based on the totality of the evidence.

### 1.    Survey Evidence Establishes that Consumers are not Confused

Perhaps the most obvious reason Pines will fail in proving likelihood of confusion is that affirmative evidence establishes consumers actually are not confused. In its motion Pines argues that proof of actual confusion—such as survey evidence—is not required. Fair enough. However, "[u]ndoubtedly, survey evidence is 'often the most persuasive' evidence concerning likelihood of confusion." *Monster, Inc. v. Dolby Laboratories Licensing Corp.*, 920 F.Supp.2d 1066, 1072 (N.D. Cal. 2013). And an appropriate survey demonstrating less than 10% consumer confusion "clearly favors the defendant." *See, e.g.*, *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1040 (C.D. Cal. 1998). Moreover, the failure of a party alleging confusion to conduct a survey may support an inference that the results of such a survey would be unfavorable. *Id.* at 1041.

Here, survey evidence reveals <u>no confusion whatsoever</u>. Applying the traditional *Everready* survey design, zero consumers identified Suja as being associated with Pines. [Poret Report at 46-47]. Likewise, a sequential line-up survey resulted in zero net confusion after controlling for "noise." [Poret Report at 43-46]. The results of these surveys alone are sufficient to preclude a finding that Pines is likely to prevail on the merits.

CALL &
JENSEN

To the extent Pines replies that it presented evidence of confusion by a representative of Kroger, that "evidence" is unreliable and inadmissible even under the relaxed evidentiary standards applicable to preliminary injunctions. Moreover, even if the Court were to consider this evidence, it does not support a finding of actual confusion. According to Mr. Seibold, the Kroger representative asked if Pines was connected with Suja. However, this evidence, if reliable, would only show that the representative picked up on the differences between Pines and Suja; he did not assume Pines and Suja were connected, but was merely curious. To the extent the Kroger representative offered an opinion that other consumers might be confused, which is not in the record, that lay opinion is clearly inadmissible under Rule 701, not to mention its hearsay nature.

In light of the persuasive survey evidence revealing no confusion, Pines cannot establish that it is likely to prevail on the merits. At best, these issues must be presented to the trier of fact in a full trial on the merits.

### 2.   "Mighty Greens" Is a Weak Descriptive Mark

Confusion is also unlikely because "Mighty Greens" is a weak trademark. *See Sleekcraft*, 599 F.2d at 349-350. The strongest marks are arbitrary or fanciful, descriptive marks are the weakest, and suggestive marks lie somewhere in between. *Id.* at 349. To determine whether a trademark is descriptive or suggestive, the Court must ask whether the mark "describes the qualities or characteristics of a product." *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 977 (9th Cir. 2010). Pines contends that "Mighty Greens" is "suggestive," but this position is difficult to reconcile with Pines' own description of the product as a "dark green blend of . . . superfoods." "Mighty Greens" clearly describes the qualities and characteristics of Pines' product. This is not even a close question.

In the phrase "mighty greens," the word "mighty" is used as an adjective to modify the noun, "greens." In this context, "mighty" means "possessing great and impressive power or strength." The New Oxford American Dictionary 1082 (Elizabeth



J. Jewell & Frank Abate eds. 2001). "Greens" means "green leafy vegetables: *salad greens | collard greens*." *Id.* at 745. Although he personally "would not use that term very much," Ron Seibold reluctantly admitted that people use the word "greens" to refer to "spinach, collards, wheat grass." [Orr Dec. Exh. 1, Seibold Depo 113:9-114:24]. Thus, "Mighty Greens" literally means "powerful green vegetables."

Pines admits that wheatgrass and alfalfa—the first two ingredients in its "Mighty Greens" product—are green vegetables. [Orr Dec. Exh. 3, Response to Request for Admission Nos. 3, 4]. And while Pines refused to admit that the term "mighty" is descriptive of the nutritional value of these green vegetables, it cannot seriously dispute that it holds these vegetables out as possessing "great and impressive power or strength." Pines describes wheatgrass and alfalfa leaf as "superfoods." *See* https://wheatgrass.com/product/mighty-greens-superfood-blend-8-oz/. Indeed, Pines went so far as to create anthropomorphic superhero characters named "Wheatgrass Willie" and "Alfalfa Allie" in order to tout the powerful nutritional benefits of these two greens. *See* https://wheatgrass.com/product/wheat-grass-willie-plush-toy/; https://wheatgrass.com/product/alfalfa-allie-plush-toy/. Pines simply cannot in good faith assert that the word "mighty" does not describe characteristics of wheatgrass and alfalfa. In short, it takes no imagination at all to connect "mighty greens" to a product made up of "green superfoods." Conceptually, "Mighty Greens" is a weak, descriptive mark.

Pines argues that a weak mark can become strong "based on actual marketplace recognition." [ECF No. 37, Motion at 21]. While that may be true, Pines has not offered evidence to establish that "Mighty Greens" has attained a high level of actual marketplace recognition. In fact, while Pines has offered Mighty Greens since the 90's, it did not even try to push it into natural food stores until 2013. [Orr Dec. Exh. 1, Seibold Depo 71:24-73:6]. Prior to that time, Pines' Mighty Greens had only a small "loyal following through the website." [Orr Dec. Exh. 1, Seibold Depo 73:3-6]. According to Pines' records, in nearly twenty years it sold less than 260,000 units total,

1   with yearly sales coming in as low as 5,901 units, and no higher than 19,195 units. [Orr

2   Dec. Exh. 2]. To get an idea of how small this number is compared to the consuming

3   public, consider that there are 116,211,092 households in the United States.

4   Census.gov/quickfacts/table/PST045215/00. Pines cannot seriously contend that its

5   "Mighty Greens" product enjoys a high level of consumer recognition.

6        Furthermore, in interrogatory responses, Pines indicated that it does not claim

7   "Mighty Greens" has actually obtained secondary meaning. Instead, it refers only to

8   continuous use and its incontestable registration. [Orr Dec., Exh. 4, Response to

9   Interrogatory No. 16]. Continuous exclusive use over a long period of time may support

10  a finding of secondary meaning, but it does not require it. Where, as here, the product

11  has almost no market penetration, continuous use is largely irrelevant. Incontestable

12  status may confer a presumption of distinctiveness, but it does not create a presumption

13  of commercial strength. Furthermore, the presumption of distinctiveness is limited to

14  use "on the products specified in the registration", which in this case is powdered

15  supplements, not juices. *See Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d

16  305, 312-15 (2000) (limited secondary meaning in registered trademark "Paco

17  Rabanne" did not extend beyond fragrance to clothing, notwithstanding decades of use).

18  A descriptive mark that enjoys almost no market recognition cannot be considered

19  strong, even if the registration has become incontestable.

20       Pines argues that advertising expenditures—which it estimates at over $700,000

21  annually—prove that "Mighty Greens" is commercially strong. However, Pines offered

22  no evidence to corroborate these "advertising" expenditures. Moreover, Pines does not

23  attempt to allocate expenditures to Mighty Greens, instead taking the position that

24  nearly all of its advertising are attributable to Mighty Greens. Pines has not offered a

25  survey or other market research to prove that average consumers associate "Mighty

26  Greens" with Pines or anyone else. In short, Pines offered no evidence at all from which

27  the Court could conclude that "Mighty Greens" is a commercially strong trademark.

28

Because "Mighty Greens" is weak both conceptually and commercially, the "strength of the mark" factor weighs against a finding that consumers are likely to suffer confusion. Rather, both Pines and Suja can use the mark on their respective products without harm to each other.

### 3.   Pines and Suja Compete In Different Market Segments

Plaintiff argues that confusion is likely because the Parties' products are related. Whether goods are "proximate" to each other is far from an exact science. Two products may fall anywhere on a spectrum between totally unrelated to identical. The use of identical trademarks on identical goods would automatically result in a finding of likelihood of confusion, whereas if the products do not compete at all likelihood of confusion is remote. *See Brookfield Communications*, 174 F.3d at 1055-56.

For products that are not identical but nevertheless competitive, the "relatedness" factor may support a finding of likely confusion. *See, e.g.*, *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F.Supp.2d 1063 (N.D. Cal. 2012) (solar thermal collectors vs. photovoltaic solar modules). But when products are only "related" this factor may be neutral or weigh against a finding of confusion. *See, e.g.*, *Icebreaker Ltd. v. Gilmar S.P.A.*, 911 F.Supp.2d 1099, 1104-05 (D. Ore. 2012) (while apparel was related, factor weighed against likelihood of confusion because one party sold performance athletic apparel and the other sold fashion apparel); *VMR Products, LLC v. V2H ApS*, No. 13-CV-7719-CBM-JEMx, 2016 WL 1177834, at *6 (C.D. Cal. Mar. 18, 2016) (relatedness factor weighed against likelihood of confusion where one party sold electronic cigarettes and the other sold smokeless tobacco); *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F.Supp.2d 1214, 1226 (C.D. Cal. 2004) ("Because the parties' clothing lines are complementary, are similar in use and function, but are not ultimately directed toward the same group of customers, this factor weighs in equipoise.); *Safeworks, LLC v. Teupen America, LLC*, 717 F.Supp.2d 1181, 1191 (W.D. Wash. 2010) (relatedness factor neutral where hoists and track mounted aerial lifts both served purpose of lifting

and lowering personnel and materials in the construction industry and post-construction maintenance industries, but were dissimilar in use and function).

Here, Suja's juice product is only tangentially related to Pines' protein powder in that they are both edible and contain green vegetables. The products compete in entirely different market segments. Suja products are found in the refrigerated section of stores, whereas Pines products are found on the supplement aisle. [Thomaselli-Baker Dec. ¶ 15; Brooks Dec. ¶¶ 2-3, Exhs. 1-17]. Suja competes with other ready-to-drink juice sellers such as Naked, Evolution Fresh, and Bolthouse [Thomaselli-Baker Dec. ¶ 15; Brooks Dec. ¶¶ 2-3, Exhs. 11-14, 16-17], whereas Pines competes with other sellers of powdered nutritional supplements, such as "Amazing Grass." [Orr Dec. Exh. 1, Seibold Depo 51:25-52:3; Brooks Dec. ¶¶ 2-3, Exhs. 1-10, 15]. Whereas Suja's product can be consumed immediately upon purchase, Pines' product must be mixed with other ingredients prior to consumption. And unless consumers were somehow to mix Pines' Mighty Greens into their own reverse engineered blend of fruit and vegetable juices and teas similar to Suja's Mighty Greens, the flavor of the products is drastically different. Thus, while Suja's and Pines' products are not entirely unrelated, they are far from identical. This factor is, at most, neutral.

### 4.  Consumers of Pines and Suja Products Are Likely to Exercise Great Care

Pines argues that consumers are unlikely to exercise great care because the products are not expensive. However, Pines offered no evidence of the actual prices of the products, and even assuming its assertions are correct, Pines' analysis oversimplifies the "consumer care" factor.

It is not enough to say that $7.50 is not a lot of money, and therefore consumers are unlikely to exercise care in deciding whether to purchase Suja juices. Rather, the Court must consider all factors that relate to the care exercised by consumers. Inexpensive items can matter a great deal, particularly when they affect a person's health. Health-and environmentally-conscious individuals are likely to exercise great

CALL&
JENSEN

care regarding the foods and supplements they consume. While Suja's "Mighty Greens" juice is not exorbitantly expensive as an absolute figure, its organic, non-GMO, cold pressured juices are relatively more expensive than other heat pasteurized, shelf stable juices. [Thomaselli-Baker Dec. ¶ 16]. Suja competes in the market segment for premium juices, where consumers are particularly concerned with the nutritional quality and environmental impact of their foods, and are willing to pay a premium for high quality. [Thomaselli-Baker Dec. ¶ 16]. These consumers approach even relatively minor purchases with great care. Thus, this Court cannot conclude based on the evidence before it that consumers are unlikely to exercise care prior to purchasing Suja products. The "consumer care" factor does not favor a finding of likely confusion.

### 5. Both Pines and Suja's Labels Clearly Identify the Source

Pines and Suja both use the same trademark, "Mighty Greens," as a name for their respective products. Therefore, it would be tempting to conclude that the "similarity of the marks" factor favors a finding of likely confusion. However, the Court must resist the temptation to apply the *Sleekcraft* factors as a rote checklist. As the Ninth Circuit has recognized, the marks must be considered "in their entirety and as they appear in the marketplace." *Brookfield Communications, Inc. v. West Coast Ent't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). When the Court considers how the Parties' respective trademarks are presented to consumers, the similarity between the marks vanishes almost entirely. Rather than supporting Pines, this factor actually supports Suja.

It is undisputed that Pines and Suja products are sold only in sealed jars or bottles. [Thomaselli-Baker Dec. ¶ 17; Orr Dec. Exh. 3, Response to Request for Admission No. 35]. Therefore, in order to consider how the marks "appear in the marketplace," the Court must review each party's packaging.

With respect to Pines' protein powder, the word "Pines" is prominently printed on every label, which communicates to consumers that the product comes from a company called "Pines." [Orr Dec. Exh. 3, Response to Request for Admission Nos. 30,

32]. Furthermore, Pines prides itself on packaging its nutritional supplements only in amber glass jars with sealed metal lids to ensure an oxygen free environment. [Orr Dec. Exh. 1, Seibold Depo 131:4-13]. And all Pines product labels use the same style or theme, indicating that all of those products come from the same company. An image of Pines' line-up of products is reproduced below:



Each of Pines' products is packaged in an amber glass jar with a green label. The brand name, "Pines" is displayed prominently in all capital letters in a dark green box at the top of the label. The product name is displayed below this box, however, the words "Mighty" and "Superfood Blend" are prominently displayed in yellow and "Greens" is set apart in green and white with less emphasis. In the background, the label displays a close up silhouette either of grass or of alfalfa leaves in front of rolling hills. The seal on the lid features the Pines logo and the word Pines in repeat. Presented with this packaging, customers can make no mistake that the products originate from a company called Pines.

Suja's products do not look at all similar to Pines'. They are sold in plastic bottles, each of which prominently display the word "Suja" with a rain drop symbol which communicates to consumers that the product comes from a company called "Suja." [Thomaselli-Baker Dec. ¶¶ 17-18]. For the smaller sizes, the product name is printed in smaller letters. "ORGANIC" is prominently displayed in the middle of the

CALL & JENSEN

bottle, followed by the ingredients in the juice. A representative line-up of Suja juices (including Mighty Greens) is displayed below.



Larger bottles feature a similar style, and always prominently display the word "Suja." [Thomaselli-Baker Dec. ¶ 18]. Clearly, when considered as they appear in the marketplace, there is no similarity between Suja's products and Pines' products.

Furthermore, the fact that Pines and Suja both have a product called "Mighty Greens" is irrelevant in light of the fact that they also offer several other products in the same line-up. Reasonable consumers will understand that the term "Mighty Greens" merely distinguishes a particular Suja juice from other Suja juices, and that it also distinguishes a particular Pines supplement from other Pines supplements. In the marketplace, Suja's products are grouped together in the refrigerator section of grocery stores, whereas Pines' products are grouped together in the nutritional supplement aisle. The images below show how Suja and Pines' products are displayed in a Sprouts Farmer's Market in Huntington Beach, California:



1
2
3
4
5
6
7
8
9
10



11   As demonstrated above, when the marks are considered as they appear in the

12   marketplace, they are not at all similar in appearance. As a practical matter, consumers

13   can be left with no doubt that Suja's "Mighty Greens" is simply one juice in a line of

14   juices originating from Suja, and that Pines' "Mighty Greens" protein powder is simply

15   one nutritional supplement in a line of supplements originating from Pines. Thus, the

16   "similarity of the marks" factor weighs against a finding of confusion.

17   **6.   Suja's Intent Was Innocent**

18       Pines argues that an intent to confuse consumers may be inferred if Suja adopted

19   the "Mighty Greens" trademark with knowledge of Pines' ownership of the mark.

20   However, such an inference is not appropriate in this case. Likelihood of confusion may

21   be established "where a mark is adopted with the intent to deceive the public," or if "an

22   infringer adopts his designation with the intent of deriving benefit from the reputation

23   of the trade-mark or trade name." *Brookfield Communications*, 174 F.3d at 1059

24   (internal quotation marks omitted). But such an inference is not appropriate when the

25   party has no intent to deceive or to capitalize on the trademark owner's goodwill.

26       Here, Suja discovered several registered trademarks for "Mighty Greens" prior to

27   adopting it, including a trademark for a nutritional supplement. [Thomaselli-Baker Dec.

28   ¶ 5]. However, Suja in good faith adopted the mark on the grounds that its juice is not

competitive with nutritional supplements. [Thomaselli-Baker Dec. ¶ 6]. Suja has never taken any steps to create an association between itself and Pines, but instead developed its own goodwill in the "Mighty Greens" mark. [Thomaselli-Baker Dec. ¶ 10]. Indeed, given that Pines' Mighty Greens is not even carried in most natural food stores, and its annual sales are miniscule,[5] it appears that Pines has no measurable goodwill associated with Mighty Greens at all. It would make no sense for Suja to attempt to capitalize on goodwill for a product that well over 99% of its customers have never heard of, let alone purchased. Survey evidence bears this out—as expected, consumers do not associate Pines' Mighty Greens product with Suja. [Poret Report at 43-47].

Pines points out that Suja has applied to register several other trademarks, but not "Mighty Greens," and argues that this evidence supports an inference of intent to deceive. The argument, however, is illogical. Suja owns many trademarks for which it has not applied for registration. [Thomaselli-Baker Dec. ¶ 7]. And because "Mighty Greens" is descriptive of Suja's product, Suja would have either needed to amass evidence of secondary meaning before filing such an application, or have used the mark in commerce for five years to obtain a presumption of secondary meaning. *See* 15 U.S.C. § 1052(f). The evidence simply does not support a finding that Suja intended to deceive consumers. The "intent to deceive" factor does not support a finding of likely confusion.

### 7.   Pines Is Not Likely to Expand Into the Juice Market

At his deposition, Ron Seibold testified that he believes ready-to-drink juice is a bad idea because it goes against the things Pines stands for. Seibold testified that Pines is against plastic bottles, against shipping water across the country, and against selling products that require pasteurization. [Orr Dec. Exh. 1, Seibold Depo 97:14-100:5]. Seibold was very clear that Pines has no plans to expand into the market for ready-to-

---

[5] The most Mighty Greens Pines ever sold in a single year was 19,159 units. [Orr Dec. Exh. 2]. By contrast, Suja sold nearly 67,000 units of its Mighty Greens product in 2014 after launching the product in the middle of the year. [Thomaselli-Baker Dec. Exh. 1].

drink juices. [Orr Dec. Exh. 1, Seibold Depo 99:24-100:5]. Thus, this factor weighs against finding that confusion is likely.

### 8.    Overlap in Marketing Channels Is Minimal

Pines argues that confusion is likely because Pines "Mighty Greens" is sold in the same channels as Suja "Mighty Greens." While there is some overlap, Pines has grossly exaggerated the convergence of marketing channels. Suja's "Mighty Greens" is sold in grocery store chains and Costco.[6] [Thomaselli-Baker Dec. ¶ 8]. Pines' Mighty Greens is not available in these channels. Until only very recently, almost all of Pines' sales of Mighty Greens were through its own website. [Orr Dec. Exh. 1, Seibold Depo 72:23-73:6]. Obviously, Suja products are not available on Pines' website. The only overlap between Pines and Suja's Mighty Greens is in the "natural foods" channel, and the online retailer, Amazon. However, at his deposition, Pines' CEO purported to not even know which natural foods stores actually stock Pines' Mighty Greens, and ultimately admitted that most stores that carry any Pines product only stock its wheatgrass powder and tablets. [Orr Dec. Exh. 1, Seibold Depo 67:23-71:1]. Pines has identified only two locations that concurrently carried Suja Mighty Greens and Pines Mighty Greens—a Mother's Market located in Santa Ana, California, and a Mother's Market located in Anaheim, California. Contrary to his sworn declaration, Ron Seibold admitted that while Sprouts carries wheatgrass powder and tablets, they generally do not stock Pines Mighty Greens. [Orr Dec. Exh. 1, Seibold Depo 68:6-69:9]. Pines claims that its Mighty Greens product is in some, but not all Whole Foods stores, but Whole Foods does not carry Suja's Mighty Greens. [Thomaselli-Baker Dec. ¶ 9]. Thus, it appears that the overlap in marketing channels is actually minimal.

Furthermore, with respect to the few stores that do carry both Suja and Pines Mighty Greens, the products are in entirely different locations of the store. Whereas Suja Mighty Greens must be stocked in the refrigerated section with the other premium

---

[6] Sales to Costco account for nearly 75% of Suja's revenue from Mighty Greens. [Thomaselli-Baker Dec. ¶ 8].

CALL & JENSEN

juices, Pines Mighty Greens is shelved in the dry goods aisle with other powdered nutritional supplements. On Amazon, Suja Mighty Greens is categorized under "Grocery & Gourmet Food," whereas Pines Mighty Greens is categorized under "Health & Household." [Brooks Dec. ¶ 4]. Because the convergence of marketing channels is minimal, this factor is neutral.

### C.   The Harm to Suja If An Injunction Issues in Error Far Outweighs Any Risk of Harm to Pines

Even if Pines had submitted sufficient evidence to prove the likelihood of irreparable harm and a likelihood of prevailing on the merits, the Court cannot issue a preliminary injunction without first weighing the equities. This means the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. 7, 24 (2008) (internal quotation marks omitted).

While it has no obligation to do so, Suja recently initiated the process of changing the name of the juice at issue from "Mighty Greens" to "Mighty Dozen." Suja estimates that it will make its last shipment of "Mighty Greens" in November 2016. Thus, Pines' request for injunctive relief will be moot within a few weeks after the hearing. In order to prevent damage to Suja, however, a brief transition period is necessary.

To the extent Pines demands an order commanding Suja to immediately cease its production and sale of "Mighty Greens," such an order would cause serious damage to Suja. Suja would lose several hundreds of thousands of dollars each week that it is prevented from filling its customers' orders, not to mention the damage to its customer relationships.[7] [Thomaselli-Baker Dec. ¶ 19].

On the other hand, the potential harm to Pines if a preliminary injunction does not issue is slight. The relief Pines seeks will be moot within a few weeks after the hearing.

---

[7] It should be noted that Pines failed to address the requirement that it give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The evidence does not support an injunction, but if it did, the injunction could not issue without security sufficient to cover the loss of revenue that Suja would suffer as a result.

In the meantime, Pines contends that sales of its flagship products—wheatgrass and wheatgrass tablets—have actually increased, meaning that it has not suffered any measurable harm to its reputation generally. And in light of the survey results indicating that average consumers do not associate Suja's juice product with Pines, the risk that Pines will suffer any real harm if Suja is not enjoined is remote.

Where, as here, the damage to Suja resulting from an erroneously issued preliminary injunction is great, and the damage to Pines resulting from the failure to issue a preliminary injunction is comparatively slight, the balance of equities weighs strongly against awarding preliminary relief.

### D.      The Public Interest Favors Denial of a Preliminary Injunction

Finally, in order to issue a preliminary injunction, the Court must find that an injunction would be in the public interest. Certainly, the public has an interest in avoiding confusion between products. However, the public also has an interest in access to valuable goods such as Suja's juice products. Thus, an injunction requiring Suja to stop selling its product would not be without cost to the public. These competing interests must be balanced.

Even if Pines carried its burden of proof on the merits (it hasn't), likelihood of consumer confusion is still a question of degree. Therefore, whether the public interest favors an injunction depends on how likely it is that confusion will occur. If confusion is "very likely," or "almost certain," then the public interest in avoiding confusion may outweigh the public interest in continued access to valuable goods. On the other hand, if confusion is only "possible" or "somewhat likely," the public interest may favor continued competition. Here, a survey shows that there is no actual confusion. Thus, even if the Court could determine that Pines is likely to prove some level of likely confusion in the future (it cannot), it cannot determine that Pines is likely to prove a high level of likely confusion. The risk of harm to the public is remote.

1

## V.  CONCLUSION

2      Even after waiting more than a year to bring its motion, Pines still has not offered

3  evidence to show that it is entitled to the extraordinary remedy it requests. The motion

4  must be denied.

5

6  Dated:  September 16, 2016          CALL & JENSEN
                                       A Professional Corporation
7                                      William P. Cole
                                       Matthew R. Orr
8                                      Samuel G. Brooks

9

10                                     By: */s/ William P. Cole*
                                           William P. Cole

11                                     Attorneys for Plaintiff Suja Life, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28