1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| SUJA, LIFE, LLC, | CASE NO. 16CV985-GPC(WVG) |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| PINES INTERNATIONAL, INC., | **REDACTED** |
| Defendant. | [Dkt. No. 37.] |

11
12
13
14
15
16
17
18
19
20
21
22

Before the Court is Defendant's motion for preliminary injunction.  (Dkt. No. 37.)  Plaintiff filed an opposition and Defendant filed a reply.  (Dkt. Nos. 50, 59.)  A hearing was held on October 14, 2016.  (Dkt. No. 64.)  Samuel Gary Brooks, Esq. and William Paul Cole, Esq. appeared on behalf of Plaintiff and Stephen Charles McArthur, Esq. appeared on behalf of Defendant.  (Id.)  Based on the reasoning below, the Court DENIES Defendant's motion for preliminary injunction.

## Procedural Background

23
24
25
26
27
28

On April 22, 2016, Plaintiff Suja Life, LLC ("Plaintiff" or "Suja") filed a Complaint against Defendant Pines International, Inc. ("Defendant" or "Pines") seeking declaratory judgment of non infringement of Pines' trademark rights in the mark Mighty Greens® and declaratory judgment regarding alleged unfair competition pursuant to California Business & Professions Code section 17200 *et seq*.  (Dkt. No.

1, Compl.) Suja seeks to protect its intellectual property rights in and to its high quality Suja Mighty Greens™ fruit and vegetable juice drink. (Id. ¶ 1.) On June 24, 2016, Defendant filed an answer and counterclaim against Plaintiff. (Dkt. No. 13.) On July 20, 2016, Defendant filed an amended answer and counterclaim against Plaintiff. (Dkt. No. 25.) In its counterclaim, Pines alleges six causes of action as it relates to Suja's alleged infringement of Pines' registered trademark of Mighty Greens®. (Id.) On August 8, 2016, Pines filed the instant motion for preliminary injunction. (Dkt. Nos. 37.) Pines seeks an injunction enjoining Suja from "marketing, advertising, distributing, and selling any and all products that use the Mighty Greens trademark and any mark confusingly similar to it." (Dkt. No. 37 at 1.) Suja argues that Pines has not demonstrated that it is entitled to the extraordinary relief of a preliminary injunction.

## Factual Background

Pines was incorporated in 1976 and is "known as a pioneer of the popular nutritional superfood and health food movement in the United States." (Dkt. No. 37-1, Seibold Decl. ¶ 2.) Pines offers a wide variety of nutritional supplements sold at grocery and natural food retail stores such as Whole Foods, Sprouts and Mother's Market across the United States and also online through retailers such as Amazon.com. (Id. ¶¶ 3, 15, 16.)

Since at least January 1, 1996, Pines has sold one of its most promising nutritional supplements in interstate commerce under the brand name Mighty Greens®. (Id. ¶ 5.) Mighty Greens is a nutrient-dense powder blend of organic wheatgrass, organic alfalfa, and other superfoods. (Id. ¶ 6.) In September 1997, Pines registered its mark, Mighty Greens with the United States Patent and Trademark Office. (Dkt. No. 37-3, Ex. B.) Pines grows other cereal grasses such as barley grass, oat grass and rye grass, but research indicates there is no difference in nutrition between any of the cereal grasses. (Dkt. No. 37-1, Seibold Decl. ¶ 6.)

Pines has spent substantial time, money, and effort developing its distinctive Mighty Greens brand and promoting it in association with its nutrient dense health food

products. (Id. ¶¶ 7, 10.) It has actively, continuously, and prominently used the Mighty Greens mark in interstate commerce in association with its goods which has been promoted through a variety of media. (Id. ¶ 8.) It uses social media such as Instagram, Facebook, Tumblr, Flickr, and Twitter to promote, advertise and market Mighty Greens. (Id. ¶ 19.) Customers, distributors, and retailers in the health food industry recognize Pines as the source of the Mighty Greens goods bearing the mark. (Id. ¶ 11.)

Pines is the registered owner of the domain name www.mightygreens.com, which is a link that directs users to Pines' main operating website where Mighty Greens can be purchased. (Id. ¶ 12.) For the past twenty years, Pines has spent on average over $700,000 per year marketing and advertising its small number of products, including the Mighty Greens brand and spent countless invaluable sweat hours promoting and marketing Mighty Greens. (Id. ¶¶ 17, 18.) Over the past two years, Pines has spent more than $100,000 on social networking and Google advertisements for its products, which strongly emphasizes its Mighty Greens brand and about half of those expenses has been solely for Mighty Greens. (Id. ¶¶ 19, 20.)

Since its creation, the sole suggested use on the label of Mighty Greens has been to stir it into water or juice and then to drink it as a beverage in liquid form. (Id. ¶ 9.) Once mixed with water and poured into a glass, its products and Suja's Mighty Greens drink are virtually indistinguishable to the average consumer. (Id. ¶ 22.) Pines has had to significantly increase its spending on advertising and marketing its own Mighty Greens product in the face of Suja's infringing use, damaging its presence in the marketplace. (Id. ¶ 23.) Despite its increase in spending, Pines has faced a 40% decrease in sales and a near futile struggle to bring about consumer awareness of its Mighty Greens trademark. (Id. ¶ 24.)

Due to the ubiquitous presence of Suja's drinks in nearly every grocer nationwide, Pines' attempts to promote, advertise, and market its own genuine Mighty Greens are a struggle and for the most part have become a waste of time and resources. (Id. ¶ 26.) In addition, Pines cannot move its Mighty Greens product into many new retail stores

or marketing channels since Suja's infringing product and identical mark have already saturated them.  (Id. ¶ 27.)

During the past twenty years, Pines has sold an estimated $9.5 million of Mighty Greens.  (Id. ¶ 29.)  In 2014, Pines sold 15,739 bottles of Mighty Greens and in 2015, it sold only 9,492 bottles of Mighty Greens despite a significant increase in advertising and promotion of Mighty Greens.  (Id. ¶ 30.)  While there should have been an increase in sales, instead, there was a 40% drop in sales from 2014 to 2015.  (Id.)  The downward trend in Mighty Greens sales is continuing as sales of Mighty Greens  to date in 2016 have been even lower than the sales to the same date in 2015.  (Id. ¶ 31.)  Over the past two years, there has been a huge upsurge in customer attention to superfoods and the market has grown exponentially.  (Id.)  Pines has attempted to take advantage of that upsurge and place Mighty Greens into supermarkets and mass markets around the country, but has mostly failed since the stores already carry Suja's Mighty Greens.  (Id. ¶ 32.)

In March 2016, at the Natural Product Expo, a representative from The Kroger Company, one of the largest supermarket chains in the world, came to Pines' booth.  (Id. ¶ 33.)  The Kroger representative mentioned Pines' Mighty Greens product and then asked if Pines was owned by Suja.  (Id.)  When Pines made a pitch to get Kroger to carry Mighty Greens, the representative's response was that it already carry it in liquid form from Suja and would not want to carry a different version of it made by a different company.  (Id.)  It seemed like the representative felt Pines was copying Suja's mark instead of Suja copying Pines' registered trademark.  (Id. ¶ 33.)  The Kroger representative proceeded to discourage Pines from pitching Mighty Greens to any other Kroger buyers because he felt it would be too confusing having two different companies with the same brand name for very similar products.  (Id. ¶ 34.)

Suja is a seller of organic, non-GMO, cold pressured juices.  (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶ 2.)  Through the large-scale use of organic and non-GMO fruits and vegetables and utilizing a breakthrough displacement technology called High

Pressure Processing, Suja has become a leading organic and cold-pressured juice brand. (Dkt. No. 1, Compl. ¶ 1.)  Suja has a large variety of products consisting of different juice blends and one of Suja's products is its Mighty Greens™ juice, which is a blend of organic apple juice, organic celery juice, organic cucumber juice, organic kale juice, organic collard greens juice, organic lemon juice, organic peppermint tea, organic spearmint tea, organic spinach juice, organic ginger juice, organic spirulina powder, organic chlorella powder, organic barley grass powder, and organic alfalfa powder. (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶ 2.)  Suja began offering Mighty Greens for sale on July 1, 2014.  (Id. ¶ 3.)  Suja did not apply for a trademark registration of "Mighty Greens."  (Id. ¶ 7.)  While Suja has several registered trademarks, it also has many products for which the trademarks are not registered; therefore, it was not out of the ordinary for Suja to not apply to register the trademark for Mighty Greens.  (Id.)

Suja has invested significantly in building the goodwill associated with Mighty Greens through a variety of advertising and promotional strategies.  (Id. ¶ 9)  Mighty Greens has been promoted through social media, in-store shopper marketing such as demos and coupons, sales marketing, and more.  (Id.)  Suja has never attempted to create an association between its Mighty Greens product and the nutritional supplement sold by Pines.  (Id.)  In fact, until Suja received a cease and desist letter from Pines that Suja was infringing Pines' trademark rights to the mark Mighty Green in June 2015, it was not familiar with Pines or its products.  (Id. ¶¶ 10, 11.)

Suja sells only refrigerated ready-to-drink beverages because the juices are perishable and does not sell any nutritional supplements. (Id. ¶ 15.)  Suja's competitors are other premium juices such as Naked, Evolution Fresh, and Bolthouse, and other premium refrigerated beverages, such as sellers of ready-to-drink teas, kombuchas, enhanced waters, and some premium sodas.  (Id.)  Pines' products, on the other hand, are stocked on the supplement aisle with other wheatgrass and protein products.  (Id.)

Suja recently initiated the process of changing the name of its Mighty Greens juice to Mighty Dozen.  (Id. ¶ 19.)  Suja expects the last shipment of Mighty Greens to

be in November 2016, and the transition will be fully completed by around January 2017. (Id.)  In the meantime, Suja will continue to produce and sell its product using the "Mighty Greens" name. (Id.)  If Suja were required to stop selling Mighty Greens before it can transition to Mighty Dozen, it will lose significant revenue and if Suja is unable to fill orders, it would create a serious disruption to its customer relationships. (Id.)

## Discussion

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Post-Winter, the Ninth Circuit has maintained its "serious questions" version of the "sliding scale" approach which authorizes injunctive relief if there are "serious questions" going to the merits and a balance of hardships that "tips sharply" in favor of the movant, so long as the other Winter elements are also met. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," Winter, 555 U.S. at 22, and the moving party bears the burden of meeting all four Winter prongs.  See Cottrell, 632 F.3d at 1135; DISH Network Corp. v. FCC, 653 F.3d 771, 776–77 (9th Cir. 2011).

**A.     Likelihood of Success on the Merits**

Defendant alleges a likelihood of success on the merits on the claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114.  Plaintiff opposes.

The Lanham Act provides "national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 198 (1985).  To prevail on a claim of trademark infringement, Plaintiff must prove "(1) that it has a protectible ownership interest in the

[16CV985-GPC(WVG)]

mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (citation omitted); 15 U.S.C. § 1114.

### 1.   Protectable Ownership Interest in the Mark

Three ways exist for a party to establish a protectable interest "(1) it has a federally registered mark in goods or services; (2) its mark is descriptive but has acquired a secondary meaning in the market; or (3) it has a suggestive mark, which is inherently distinctive and protectable." Applied Info. Sciences Corp. v. eBay, Inc., 511 F.3d 966, 969 (9th Cir. 2007).  Registration of a mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and the registrant's exclusive use of the mark on the goods and services specified in the registration.  Id.; see also 15 U.S.C. § 1057(b) ("A certificate of registration of a mark . . . shall be prima facie evidence of the validity of the registered mark. . . .")  In addition, a trademark owner owns an incontestable federal registration if it has actively, continuously and prominently used the mark in interstate commerce for five consecutive years after registering it.  15 U.S.C. § 1065.  An incontestable registration status is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the registration."  15 U.S.C. § 1115(b).

In 1997, Pines obtained a trademark registration for "Mighty Greens" as a "vegetable based nutritional supplement consisting primarily of dried or extracted plant material". (Dkt. No. 37-3, Exs. B, C, D, E.)  In addition, Pines has an incontestable mark for Mighty Greens as it has actively, continuously and prominently used the Mighty Greens mark in interstate commerce for five consecutive years after registering it. (Id.)  Suja does not contest that Pines has a protectable ownership interest in Mighty Greens.  Thus, the Court concludes that Pines has a protectable ownership interest in the mark Mighty Greens for "vegetable based nutritional supplement consisting primarily

[16CV985-GPC(WVG)]

1  of dried or extracted plant material." (Id., Ex. B.)

2       **2.**    **Likelihood of Confusion**

3       "The test for likelihood of confusion is whether a 'reasonably prudent consumer'

4  in the marketplace is likely to be confused as to the origin of the of the good or service

5  bearing one of the marks." Entrepreneur Medica, Inc. v. Smith, 279 F.3d 1135, 1140

6  (9th Cir. 2002). Under Sleekcraft, the court analyzes likelihood of confusion by looking

7  at eight factors: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of

8  the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of

9  care likely to be exercised by the consumer; (7) defendant's intent in selecting the mark;

10 and (8) likelihood of expansion of the product lines." AMF Inc. v. Sleeckraft Boats,

11 599 F.2d 341, 348-49 (9th Cir. 1979) abrogated on other grounds by Mattel, Inc. v.

12 Walking Mountain Prod., 353 F.3d 792, 810 n.19 (9th Cir. 2003). The factors are

13 "pliant" with some factors being more important than others and the relative importance

14 of each factor being case-specific. Brookfield Comms., Inc. v. West Coast Entm't Corp,

15 174 F.3d 1036, 1054 (9th Cir. 1999).

16      **i.**    **Strength of the Mark**

17      As a general matter, "[t]he more likely a mark is to be remembered and associated

18 in the public mind with the mark's owner, the greater protection the mark is accorded

19 by trademark laws." GoTo.com v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir.

20 2000). A mark's strength is evaluated conceptually and commercially. Id.

21      Conceptually, marks are categorized "along a spectrum of increasing inherent

22 distinctiveness." Id. "From weakest to strongest, marks are categorized as generic,

23 descriptive, suggestive, and arbitrary or fanciful." Id.; see Alpha Indus., Inc. v. Alpha

24 Steel Tube & Shapes, 616 F.2d 440, 445 (9th Cir. 1980). An arbitrary or fanciful mark

25 is a strong mark and is inherently distinctive and will be afforded wide trademark

26 protection from infringement. Sleekcraft, 599 F.2d at 349 (citations omitted). On other

27 end of the spectrum is a generic mark which refers to the "'genus of which the particular

28 product or service is a species,' i.e., the name of the product or service itself" and is

1   entitled to no protection at all. Advertise.com v. AOL Adver., Inc., 616 F.3d 974, 977
2   (9th Cir. 2010) (advertise.com was generic mark because, *inter alia*, it reflects the genus
3   of the services offered).

4       In between the spectrum are suggestive and descriptive marks with suggestive
5   marks receiving greater protection than descriptive marks. Pom Wonderful LLC v.
6   Hubbard, 775 F.3d 1118, 1126 (9th Cir. 2014). A "descriptive mark tells something
7   about the product", Sleekcraft, 599 F.2d at 349, or "define[s] qualities or characteristics"
8   about the product, Pom Wonderful, 775 F.3d at 1126, and it will be protected only when
9   secondary meaning is shown. Sleekcraft, 599 F.2d at 349. A suggestive mark "subtly
10  connote[s] something about the product" and, "although less distinctive than an
11  arbitrary or fanciful mark" and therefore weak in comparison to such a mark, "a
12  suggestive mark will be protected without proof of secondary meaning." Sleekcraft,
13  599 F.2d at 349 (citations omitted). "[S]uggestive marks convey impressions of goods
14  that require the consumer to 'use imagination or any type of multistage reasoning to
15  understand the mark's significance.'" Pom Wonderful, 775 F.3d at 1126 (citation
16  omitted).

17      Pines argues that Mighty Greens is at a minimum a suggestive mark. Suja argues
18  that Mighty Greens is weak conceptually since it is not suggestive as it clearly describes
19  the qualities and characteristics of the product.

20      Pines has not argued or provided proof that Mighty Greens has acquired a
21  secondary meaning[1]; therefore, Mighty Greens is not protectable as a descriptive mark.
22  See Sleekcraft, 599 F.2d at 349; Japan Telecom, Inc. v. Japan Telecom America Inc.,
23  287 F.3d 866, 875 (9th Cir. 2002) (descriptive mark was not protectable as there was
24  no genuine issue of fact that the mark had acquired secondary meaning). The parties
25  dispute whether Mighty Greens is a suggestive mark. In the New Oxford American

26  

27      [1]In its brief, Pines summarily argues that "Mighty Greens® has acquired
    extensive common law trademark rights, goodwill, acquired distinctiveness, and
28  secondary meaning throughout the United States" but does not provide further
    argument or proof. (Dkt. No. 37 at 7-8.)

[16CV985-GPC(WVG)]

1  Dictionary, "greens" is defined as "green leafy vegetables." (Dkt. No. 50-2, P's App'x
2  of Authorities at 4.)  "Mighty" is defined as "possessing great and impressive power or
3  strength, esp on account of size." (Id. at 5.)  Pines' CEO describes its Mighty Greens
4  as a "nutrient-dense powder blend of organic wheatgrass, organic alfalfa, and other
5  superfoods." (Dkt. No. 37-1, Seibold Decl. ¶ 6.)   The Mighty Greens bottle states
6  "SUPERFOOD BLEND" and underneath those words, it states, "Wheatgrass, Alfalfa
7  & Hemp Protein Powder." (Dkt. No. 37-14, Ex. L.)

8      By putting both words together, Mighty Greens conveys strength from traditional
9  green, leafy vegetables and does not independently convey to the consumer that Mighty
10 Greens is a "powder blend of organic wheatgrass, organic alfalfa, and other superfoods"
11 but requires consumers to use some thought to understand its meaning.  Therefore, the
12 Court concludes that "Mighty Greens" is a suggestive mark.

13     Pines also argues that Mighty Greens has commercial strength while Suja argues
14 that the mark is weak commercially.  A suggestive mark is still "presumptively weak"
15 but can be converted into a strong mark if it has achieved sufficient marketplace
16 recognition. Pom Wonderful, 775 F.3d at 1126 (citing Brookfield, 174 F.3d at 1058).
17 Courts can look to factors such as extensive advertising, length of exclusive use and
18 public recognition. Entrepreneur Media, Inc., 279 F.3d at 1144. "Commercial strength
19 is based on 'actual marketplace recognition,' and thus 'advertising expenditures can
20 transform a suggestive mark into a strong mark.'" Network Automation, Inc. v.
21 Advanced Sys. Concept, Inc., 638 F.3d 1137, 1149 (9th Cir. 2011) (quoting Brookfield,
22 174 F.3d at 1058).

23     From a commercial standpoint, Mighty Greens has been on the market since 1996
24 long before Suja's Mighty Greens came on the market in 2014, which demonstrates a
25 long period of exclusive use.  However, Pines did not move into the natural food stores
26 until around 2013. (Dkt. No. 50-4, Orr Decl., Ex. 1, Seibold Depo. at 71:2-15.)  Prior
27 to 2013, Mighty Greens was sold through direct retail. (Id. at 8-10.)  In its almost
28 twenty year history, Pines has sold ████████████of Mighty Greens. (Dkt. No. 54-2, Orr

1  Decl. Ex. 2. (UNDER SEAL).)  Breaking it down, Pines has sold about ████████per

2  month.  In contrast, Suja sold ███████████since it began sales of Mighty Greens

3  in mid-2014.  (Dkt. No. 54-1, Thomaselli-Baker Decl, Ex. 1 (UNDER SEAL.))  While

4  there have been sales of Pines' Mighty Greens, they do not appear to be so substantial

5  as to have created a clear presence in the market.  See Pom Wonderful, 775 F.3d at

6  1126-27 (strength of POM mark is strong as plaintiff had sold more than 190 million

7  bottles of juice during the past 12 years).

8      Pines further states that it has spent on average $700,000 per year on marketing

9  and advertising which includes Mighty Greens but as Suja points out, Pines does not

10  state what percentage of the $700,000 was used to market Mighty Greens.  Pines' CEO,

11  Ron Seibold also states that about half of the $100,000 it spent on online advertising

12  and networking in the past two years has been on Mighty Greens.  (Dkt. No. 37, Seibol

13  Decl. ¶ 20.)  While it appears that Pines may have increased its advertising in the past

14  two years on Mighty Greens, based on its twenty year history, it does not appear that it

15  has achieved commercial strength sufficient to establish marketplace recognition.

16  Therefore, Pines has not established the strength of its mark is strong and weighs against

17  finding a likelihood of confusion.

18          **ii.    Proximity of the Goods or Relatedness of Goods**

19      "Related goods are generally more likely than unrelated goods to confuse the

20  public as to the producers of the goods."  Brookfield, 174 F.3d at 1055.  "Related goods

21  (or services) are those 'which would be reasonably thought by the buying public to

22  come from the same source if sold under the same mark.'"  Rearden LLC v. Rearden

23  Commerce, Inc., 683 F.3d 1190, 1212 (9th Cir. 2012) (quoting Sleekcraft, 599 F.2d at

24  348 n. 10).  "The more likely the public is to make such an association, the less

25  similarity in the marks is requisite to a finding of likelihood of confusion."  Sleekcraft,

26  599 F.2d at 350.  "Thus, less similarity between the marks will suffice when the goods

27  are complementary . . . the products are sold to the same class of purchasers . . .or the

28  goods are similar in use and function."  Id. (internal citations omitted).

1    If the marks are identical and are used with identical products or services, then

2    "likelihood of confusion would follow as a matter of course." Brookfield, 174 F.3d at

3    1056.  To be related goods, the parties do not need to be direct competitors as long as

4    the goods are similar in use and function. Pom Wonderful LLC, 775 F.3d at 1126

5    (citations omitted).  In addressing this factor, the "focus is on whether the consuming

6    public is likely somehow to associate" Suja's Mighty Greens with Pines' Mighty

7    Greens.  See Brookfield, 174 F.3d at 1056; see also Recot, Inc. v. Becton, 214 F.3d

8    1322, 1329 (Fed .Cir. 2000) (noting that the relevant question is whether the "goods can

9    be related in the mind of the consuming public as to the origin of the goods").

10   In Pom Wonderful, the court concluded that the juice beverage and energy drink

11   products were related goods as both are pomegranate-based or flavored, single-serve,

12   and marketed for their healthful properties.  775 F.3d at 1126 (noting that although

13   Pur's pom's carbonated energy drink is somewhat different than Pom Wonderful's POM

14   100% juice beverages, the use and function of the products are clearly related.)  In

15   Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 153-55 (9th Cir.

16   1963), the Ninth Circuit concluded that beer and whiskey were sufficiently similar

17   products to create a likelihood of confusion regarding the source of origin when sold

18   under the same trade name.  In Altairia Corp. v. Woodbold Distrib., LLC, NO. A-14-

19   CA-471-SS, 2014 WL 3121899, at *4 (W.D. Texas July 7, 2014), the court concluded

20   that there was minimal confusion where the products shared some similarities but were

21   different in that the NEON ENERGY DRINK is a pre-canned energy drink beverage

22   similar to Red Bull or Monster while NEON SPORT products are marketed as dietary

23   and nutritional supplements sold in powder and capsule form.  Id. at 4 (internal

24   quotation omitted).

25   Pines argues that the two products are related because they are promoted as

26   "nutrient dense" mixtures containing alfalfa grass and other healthy plant materials and

27   are targeting the same types of consumers.  Suja asserts that its juice products are only

28   tangentially related to Pines' protein powder in that they are both edible and contain

green vegetables.  In addition, Suja's products are found in the refrigerated section of stores while Pines' products are found on the supplement aisle.  Lastly, in use, Suja's products can be consumed immediately upon purchase while Pines' products must be mixed with other ingredients prior to drinking.

Here, Suja's "Mighty Greens" is not a substitute for Pines' "Mighty Greens." Suja's direct competitors are brands such as Naked, Evolution Fresh, and Bolthouse that sell ready-to-drink beverages containing organic juice and vegetables.  While Suja and Pines are not direct competitors, they are related to the extent that they cater to the same class of consumers, those who are health conscious and consume nutritional beverages.  The function of both products are similar because they both provide the body with a nutrient-filled drink.  However, the use of the products is not related since Pines' Mighty Greens comes in powder form that must be mixed with a liquid prior to consuming while Suja's Mighty Greens is sold in liquid form and immediately consumable.  The Court concludes the two products are somewhat related and this factor weighs slightly in favor of Pines.

### iii.   Similarity of the Marks

"[T[he similarity of the marks . . . has always been considered a critical question in the likelihood-of-confusion analysis." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000); Brookfield, 174 F.3d at 1054 ("The similarity of the mark will always be an important factor.")  "Three general principles help determine whether the marks are similar.  First, [s]imilarity is best adjudged by appearance, sound, and meaning.  Second, the marks must be considered in their entirety and as they appear in the marketplace.  Third, similarities are weighed more heavily than differences." Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1032 (9th Cir. 2010) (citations and internal quotations omitted).  Even where the marks are identical, there may be no trademark infringement if the alleged infringers is "in a different geographic area or in a wholly different industry." Brookfield, 174 F.3d at 1054.  Moreover, even where the marks are identical, "their similarity must be

considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the[ir] purchase." Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 1245 (9th Cir. 1984).

"Packaging is certainly a factor in the overall appearance of a mark in the marketplace." PowerFood, Inc. v. Sports Science Inst., No. C-93-0259 MHP, 1993 WL 13681782, at *6 (N.D. Cal. Mar. 11, 1993). The Ninth Circuit has held that use of a housemark or distinctive logo on packaging and advertising can reduce the likelihood of confusion. Lindy Pen Co., Inc., 725 F.2d at 1245 n. 4 (citing Sleekcraft, 500 F.2d at 351). In Sleekcraft, the court disagreed with the appellee's argument that the distinctive logo on his boats and brochures negates the similarity of the words. Id. at 351. The court noted that defendant's logo was down-played in the brochures and advertisements, and were smaller and skewed to one side while the mark was emphasized in the promotional materials. Sleekcraft, 599 F.2d at 351. The court concluded that the mark was the more conspicuous and indicated the source of origin to the public and held that the marks were similar. Id. at 351.

Meanwhile, in Lindy Pen Co., after concluding that the marks themselves were identical if viewed in isolation, the Ninth Circuit looked at how the Lindy's "Auditor's" and Bic's "Auditor's fine point" appeared in the marketplace and held that the appearance of the pens, their packaging, and their display and promotional materials were dissimilar and readily distinguishable. Lindy Pen Co., 725 F.2d at 1245. The court observed that the pens' dissimilar appearance, dominance of the company marks and logos on the pens themselves, and the dissimilar and distinctive packaging and promotional material overcame the similarity of the marks considered in isolation. Id.; see also Charles Schwab & Co., Inc. v. Hibernia Bank, 665 F. Supp. 800, 808 (N.D. Cal. 1987) (the housemark was downplayed in brochures and advertisements while the infringing mark was in bold and more conspicuous mark; therefore, marks were identical); PowerFood, Inc., 2013 WL 13681782, at *7 ("packaging element which renders marks dissimilar is the appearance of conspicuous 'house marks', or producer

1   names, on the labels.")

2       Pines maintains that Mighty Greens™ and Mighty Greens® are alphanumerically
3   identical and are confusingly similar as displayed on the products themselves.  They
4   both use the same letters, are in capital letters on a green background surrounded by
5   claims as to their nutritional and health food status when consumed.  Both suggest an
6   organic mixture of powerful, healthy, nutritious ingredients, leaving the same
7   commercial impression on the consumer.  In sum, Pines argues that the marks are highly
8   similar in sound, appearance, meaning and overall commercial impression.

9       Suja responds that when the Court looks at how the parties' respective trademarks
10  are presented to consumers, the similarities between the marks vanishes.  Pines
11  packages its powder form in an amber glass jar with a green label with sealed metal lids
12  to ensure an oxygen free environment.  The jars prominently display the brand name,
13  "PINES", in all capital letters in a dark green box at the top of the label with the product
14  name below.  "MIGHTY" and "SUPERFOOD BLEND" are prominently displayed in
15  yellow and "GREENS" is set apart in green and white with less emphasis.  The seal on
16  the lid features the Pines logo in repeat, and the background of the label displays a close
17  up silhouette of grass or alfalfa leaves in front of rolling hills.  In contrast, Suja's
18  products are sold in plastic bottles with the word "Suja" prominently displayed along
19  with a rain drop symbol which informs the consumer that the product comes from Suja.
20  On the smaller bottles, the product name is printed in smaller letters with "ORGANIC"
21  displayed in the middle of the bottle followed by the ingredients in the juice. Larger
22  bottles feature a similar style and always prominently display "Suja".   In the
23  marketplace, Suja products are grouped together in the refrigerator section while Pines'
24  products are grouped together in the nutritional supplement aisle along with other
25  products in the same line-up.  According to Suja, when the marks are considered as they
26  appear in the marketplace, they are not at all similar in appearance.

27      While Pines focuses on the identical words used in the marks and Suja focuses
28  on how the marks appear in the marketplace, the Court must consider both.  See Fortune

1  Dynamic, Inc., 618 F.3d at 1032.  Both marks are identical in sight, sound, and meaning

2  as they use the same words, Mighty Greens, and both are nutrient dense drinks.  Id.

3  (marks sound the same and look similar because they are the same word).  However, the

4  Court must also consider how the marks appear in the marketplace, including how they

5  are packaged.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23




24  Here, the packaging of both products are dissimilar.  Pines' Mighty Greens

25  product is sold in amber glass jars.  In the middle of the label is the word MIGHTY in

26  block yellow capital letters with the letters slanting upward and the word GREENS just

27  below in white capital letters but in a smaller font size than MIGHTY.  Above the words

28  MIGHTY GREENS, the word PINES appears in white capital letters in a dark green box

1  with a font size that is smaller than the font size of MIGHTY but larger than the font
2  size of GREENS.  Below MIGHTY GREENS are the words SUPERFOOD BLEND in
3  yellow capital letters a similar font size as GREENS.  The words, PINES and MIGHTY
4  are the most conspicuous and stand out with SUPERFOOD BLEND and GREENS
5  following in conspicuousness.

6      In contrast, Suja's Mighty Greens drink is sold in a narrower and taller clear
7  plastic bottles with the name "suja" in small case letters in a large font prominently
8  displayed with a rain drop symbol above "suja".  The words, MIGHTY GREENS, is
9  below "suja" in all capital letters but in a smaller font size than "suja."  Then below
10  MIGHTY GREENS, the word ORGANIC is displayed in the middle of the bottle in
11  capital letters in a larger font size than MIGHTY GREENS.  Below ORGANIC are the
12  thirteen ingredients in the juice listed in all capital letters with a similar or slightly larger
13  font size than the words, MIGHTY GREENS.  The words ORGANIC and "suja" are the
14  most conspicuous on the bottle.  Because of the listing of thirteen ingredients in all
15  capital letters that occupy half the bottle label, the  words MIGHTY GREENS are
16  downplayed and hidden and not conspicuous.

17      In addition, the two products are not sold or promoted next to each other in the
18  grocery stores.  Suja's Mighty Greens juices are in the refrigerated section along with
19  other direct competitors for refrigerated vegetable and juice drinks such as Naked,
20  Evolution Fresh and Bolthouse.  On the other hand, Pines' Mighty Greens powder jars
21  are sold in the nutritional supplement aisle.

22      Pines argues that when its Mighty Greens powder is mixed with water, it looks
23  identical to Suja's juice and the two products are indistinguishable.  However,
24  likelihood of confusion is analyzed at the time of purchase, not after the product is ready
25  to drink.  See Lindy Pen Co., 725 F.2d at 1245 (similarity must be considered in light
26  of the way the marks are encountered in the marketplace and the circumstances
27  surrounding the purchase).  Accordingly, despite the fact that the marks are identical,
28  in considering how the marks appear in the marketplace, the Court concludes that the

[16CV985-GPC(WVG)]

1   marks are dissimilar.

2                    **iv.    Evidence of Actual Confusion**

3           Pines argues that it is reasonable for the Court to make an inference of actual

4   consumer confusion based on a comparison of the conflicting marks and the context of

5   their use in the marketplace.  In addition, Pines asserts that actual confusion was

6   demonstrated when a representative from Kroger Company came to Pines' booth and

7   asked if Pines was owned by Suja and that since Kroger already carries Mighty Greens

8   in liquid form from Suja, it did not want to carry a different version of it made by a

9   different company.  (Dkt. No. 37-1, Seibold Decl. ¶¶ 33-34.)   Alternatively, Pines

10  contends that even if the Court does not find actual consumer confusion, it does not

11  defeat a finding of likelihood of confusion as evidence of actual customer confusion is

12  not an important <u>Sleekcraft</u> factor on a motion for preliminary injunction.

13          In response, Suja presents an expert's survey evidence that there is no actual

14  customer confusion between Suja's Mighty Greens and Pines' Mighty Greens.

15  According to the Everready survey design, no consumers identified Suja as being

16  associated with Pines and the same resulted after controlling for "noise." (Dkt. No. 50-

17  8, Poret Expert Report at 43-46, 46-47.)   In reply, Pines argues that the survey is

18  irrelevant, premature and not needed at this stage.  Furthermore, Pines summarily

19  challenges the survey's methodology and conclusions.

20          Courts often rely on three types of evidence of actual confusion: "(1) evidence of

21  actual instances of confusion; (2) survey evidence; and (3) inferences arising from

22  judicial comparison of the conflicting marks and the context of their use in the

23  marketplace." <u>Maxim Integrated Prods., Inc. v. Quintana</u>, 654 F. Supp. 2d 1024, 1035

24  (N.D. Cal. 2009) (quoting <u>Cytosport</u>, 617 F. Supp. 2d at 1073).

25          "Evidence that use of the two marks has already led to confusion is persuasive

26  proof that future confusion is likely."  <u>Sleekcraft</u>, 599 F.2d at 352.  The Ninth Circuit

27  has recognized that proving actual confusion is difficult; therefore, the failure to prove

28  instances of actual confusion is not dispositive. <u>Id.</u> at 352-53.  At the preliminary

1  injunction stage, this factor's importance is diminished.  <u>Network Automation, Inc.</u>, 638

2  F.3d at 1151.  Therefore, if there is evidence of past confusion, then this factor is

3  weighed heavily.  <u>Sleekcraft</u>, 599 F.2d at 353.

4         Here, to show evidence of actual confusion, Pines presents a hearsay declaration

5  of its CEO, Seibold, that a Kroger representative asked if Pines was owned by Suja and

6  that since Kroger already carries Mighty Greens in liquid form from Suja, it did not

7  want to carry a different version of it by a different company. (Dkt. No. 37-1, Seibold

8  Decl. ¶¶ 33, 34.)  He felt it would be to confusing with two different companies having

9  the same brand name for very similar products.  (<u>Id.</u>)

10        First, the comments made by the Kroger representative is improper hearsay.

11  Second, a representative of a retail store is not considered an actual consumer.  <u>See</u>

12  <u>Maxim Integrated Prods., Inc.</u>, 654 F. Supp. 2d at 1035 (instances of actual confusion

13  were product reviewers and not actual consumers; therefore there was lack of evidence

14  of actual confusion).   Therefore, Pines has not demonstrated evidence of actual

15  confusion. However, failure to present instances of actual confusion is not dispositive.

16  <u>See</u> <u>Sleekcraft</u>, 599 F.2d at 352-53.  While Suja has provided expert survey evidence

17  that there is no evidence of actual confusion, Pines disputes the contents of the survey

18  and the Court declines to rely on its conclusions without a full analysis of its reliability.

19  Since it is Pines' burden to demonstrate actual confusion, the fact that is has not

20  demonstrated is not critical as the Ninth Circuit has not placed importance to this factor

21  on a motion for preliminary injunction.  <u>Academy of Motion Picture Arts & Sciences</u>

22  <u>v. Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1456 (9th Cir. 1991)  ("[I]n this

23  circuit, actual confusion is not necessary to a finding of likelihood of confusion under

24  the Lanham Act.").  Accordingly, the Court places no weight on this factor.

25                    **v.    Marketing Channels Used**

26        "Convergent  marketing  channels  increase  the  likelihood  of  confusion."

27  <u>Sleekcraft</u>, 599 F.2d at 353. "In assessing marketing channel convergence, courts

28  consider whether the parties' customer bases overlap and how the parties advertise and

1   market their products." Pom Wonderful, 775 F.3d at 1130.  "When examining the
2   marketing channels used by the competing companies, [the Court] considers "where the
3   goods or services are sold, the sales and marketing methods employed, and the class of
4   purchasers exposed to the marketing efforts." La Quinta Worldwide LLC v. Q.R.T.M.,
5   S.A. de C.V., 762 F.3d 867, 876-77 (9th Cir. 2014) (citing Sleekcraft, 500 F.2d at 353).

6        However, the Ninth Circuit has noted that this factor does not shed much light on
7   likelihood of confusion if marketing or advertising is jointly done on the Internet.  See
8   Network Automation, 638 F.3d at 1151 ("Today, it would be the rare commercial
9   retailer that did not advertise online, and the shared use of a ubiquitous marketing
10  channel does not shed much light on the likelihood of consumer confusion."); Playboy
11  Enters., Inc. v. Netscape Comm'ns. Corp., 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given
12  the broad use of the Internet today, the same could be said for countless companies.
13  Thus, this factor merits little weight."); Hanginout, Inc. v. Google, Inc., 54 F. Supp. 3d
14  1109, 11 (S.D. Cal. 2014) (parties' shared use of the Internet and iTunes app store to
15  market their respective products weighs against likelihood of confusion); Boldface
16  Licensing %8F Branding v By Lee Tillet, Inc., 940 F. Supp. 2d 1178, 1194 (C.D. Cal.
17  2013) ("fact that both parties sell products online adds little weight to this factor").

18       Pines argues that it and Suja sell their products at the same grocery retailers, such
19  as Mother's Market and Sprouts, (Dkt. No. 37-1, Seibold Decl. ¶ 15), and advertise side-
20  by-side online and on social media.  (Id. ¶ 21.)  When conducting a search on Google
21  or on Amazon, both parties' "Mighty Greens" products appear side-by-side and appear
22  under the same category of "Grocery & Gourmet Food."  Both products are also
23  promoted and marketed heavily on the same social media platform.  Once its Mighty
24  Greens is mixed with water, the two products are indistinguishable.[2]

25       In response, Suja contends that the overlap in marketing channels is minimal, but

26

27       [2]Pines also argues that Suja and Pines attend the same industry trade shows such
28  as the Natural Products Expos East and West, and are featured in the same trade
    industry publications.  However, Pines does not provide evidentiary support for its
    argument and the Court declines to consider these facts.

it does acknowledge there is some overlap.  Suja's Mighty Greens is sold in grocery store chains and Costco while Pines' does not sell at these outlets.  (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶ 8.)  The only overlap is in the "natural foods" stores and online retailer, Amazon.  Seibold even states that Sprouts carries Pines' products but not the Mighty Greens product.  (Dkt. No. 50-4, Orr Decl., Ex. 1, Seibold Depo. at 68:6-69:9.)  While Pines sells Mighty Greens at Whole Foods, Suja does not carry its juices at Whole Foods.  (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶ 9.)  Moreover, even in the stores they both sell their products, the products are in different locations of the store and on Amazon, Suja's Mighty Greens is categorized as "Grocery & Gourmet Food" while Pines' Mighty Greens' is categorized under "Health & Household." (Dkt. No. 50-5, Brooks Decl. ¶ 4.)

Pines expends much argument addressing sales and marketing on the Internet; however, the fact that both companies sell their products on the internet bears little weight on this factor.  See Playboy Enters., Inc., 354 F.3d at 1028.  Nonetheless, there is some overlap in the marketing channels used since both products are marketed or advertised in some of the same natural food stores.  Therefore, this factor slightly favors Pines.

**vi.    Degree of Care Likely to be Exercised by the Consumer**

"Low consumer care . . . increases the likelihood of confusion." Playboy Enters., Inc., 354 F.3d at 1028. "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." Brookfield, 174 F.3d at 1060. When "the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Sleekcraft, 599 F.2d at 353 (citations omitted). This factor focuses on the "relative sophistication of the relevant consumer, and the degree of care likely to be exercised by that consumer." Id.  "In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." Surfvivor Media, Inc. v. Survivor Prods.,

406 F.3d 625, 634 (9th Cir. 2005). "A consumer exercising a great deal of care would be less likely to be confused as to the source of the product." Hero Nutritionals LLC v. Nutraceutical Corp., No. SACV 11-1195AG(MLGx), 2013 WL 4480674, at *7 (C.D. Cal. Aug. 16, 2013)

Consumers choosing products that "affect their physical appearance and health" are "likely to exercise a great deal of care." Nature's Best, Inc. v. Ultimate Nutrition, Inc., 323 F. Supp. 2d 429, 434 (E.D.N.Y. 2004) ("it seems highly unlikely that confusion between these two nutritional supplements will occur when it is precisely the nutritional aspect of the product that is of greatest significance to the buyers in question."); Hero Nutritionals LLC, 2013 WL 4480674 at *7 (noting that consumers of products at health and natural food stores are more likely to pay attention to the types and quality of the supplements they purchase); Kreation Juicery, Inc. v. Shekarchi, No. CV 14-658 DMG(ASx), 2014 WL 7564679, at *8 (C.D. Cal. Sept. 17, 2014) (reasonable to infer that customers would exercise a great deal of care in choosing where to eat as customers were health conscious customers who cared where the ingredients in their dishes originated and how they were grown).

Pines argues that both Mighty Greens products are inexpensive grocery store beverages that consumers are going to purchase frequently as they incorporate the beverages in their daily lives so consumers are not likely to exercise a high degree of care. Suja responds that while the cost[3], as an absolute figure, of its juices are not expensive, healthy and environmentally-conscious individuals are likely to exercise great care in choosing the foods and supplements they consume. Moreover, its products are more expensive than other juices sold on the shelves and consumers who are concerned about nutritional quality and environmental impact of their foods will pay a premium for high quality. (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶ 16.) The cost of a bottle of its Mighty Greens will be more expensive than an equal volume of store

[3]Suja's Mighty Greens cost about $7.50 to $14.00 and Pines' Mighty Greens cost about $25 to $37.50. (Dkt. No. 37 at 28.)

[16CV985-GPC(WVG)]

brand juice from concentrate and its customers who are particularly health conscious will pay a premium for the high quality cold-pressurized, organic, non-GMO juices. (Id.)

Both parties agree that their consumers are health-conscious and environmentally aware shoppers.  (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶ 16; Dkt. No. 37 at 24.)  As such, they are educated shoppers and will pay a premium for these nutrient-dense products and are more likely to exercise a higher degree of care.  Therefore, this factors weighs against a likelihood of confusion.

### vii.    Intent in Selecting the Mark

"The law has long been established that if an infringer 'adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities.'" Brookfield, 174 F.3d at 1059.  "An inference of confusion has similarly been deemed appropriate where a mark is adopted with the intent to deceive the public." Id. However, an "intent to confuse consumers is not required for a finding of trademark infringement." Id.; GoTo.com, Inc., 202 F.3d at 1208 (noting "minimal importance of the intent factor"); New West Corp. v. NYM Co. of Calif., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979) ("Neither actual confusion nor intent are necessary to a finding of Likelihood of confusion under the Lanham Act.")  "Instead, this factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration)." Id.   "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."  Official Airlines Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993).

Defendant argues that Suja used or adopted the mark with knowledge, actual or constructive, that it was Pines' trademark and therefore an inference of an intent to confuse can be made.  Defendant points out that while Suja has at least forty federal trademark application for its many juice products, Suja did not seek a trademark on

Mighty Greens because it knew it would be rejected due to Pines' Mighty Greens registration. In addition, Suja even put a TM symbol demonstrating it is using "Mighty Greens" as a trademark. Finally, on May 28, 2015, Pines wrote Suja a letter demanding it cease using Mighty Greens and placed Suja on notice of the incontestable Mighty Greens trademark, yet Suja has not stopped using the mark. Suja replies that its intent was innocent and did not seek to deceive or capitalize on Pines' trademark.

Here, Suja' Chief Administrative Officer explained the process Suja took to select the name of Mighty Greens. (Dkt. No. 50-7, Thomaselli-Baker Decl. ¶¶ 4-6.) Before settling on the name, she searched for Mighty Greens on the trademark office website and found registrations for numerous Mighty Greens trademarks for different goods and services, including a "vegetable based nutritional supplement consisting primarily of dried or extracted plant material", Mighty Greens No. 2100194. (Id. ¶ 5.) While other companies had registrations for "Mighty Greens" they not were in a category for juices or other beverages so Suja decided that the trademark was available for Suja to use on its juice product. (Id. ¶ 6.) At the time, she did not further investigate Pines' "vegetable based nutritional supplement" and was not aware that Pines was using the trademark for a blend of wheatgrass, alfalfa and hemp powder sweetened with stevia. (Id.) Then in June 2014, Suja received a letter from Pines alleging it was infringing Pines' trademark rights to the mark "Mighty Greens". (Id. ¶ 11.)

In reply, Pines presents the deposition of Suja's CEO who testified ███████████████ ███████████████████████████████████████████████(Dkt. No. 58–2, McArthur Decl, Ex. 1, Church Depo. at 43:19-44:11 (UNDER SEAL).) He also stated that one of the reasons████████████████████████████████████████ ████████████████████. (Id. at 46:19-22 (UNDER SEAL).)

Church's deposition reveals that Suja knowingly adopted Mighty Greens even though it knew Pines had a registered its Mighty Greens mark. Therefore, the Court may infer an intent to deceive the public. DC Comics v. Towle, 989 F. Supp. 2d 948, 960 (C.D. Cal. 2013) (inferring an intent to deceive where defendant admitted

[16CV985-GPC(WVG)]

1  knowledge of the Batman marks and knowingly copied them).  This factor weighs in
2  favor of Pines.

3           **viii.   Likelihood of Expansion of the Product Lines**

4           Pines argues that this factor is not important because Pines and Suja are already
5  direct competitors or this factor weights in its favor since it is logical that it would
6  expand into the pre-prepared liquid drink market because most companies sell both a
7  powder and liquid form of their beverages.  Suja opposes asserting that Seibold, the
8  CEO of Pines, testified that it has no plans to expand into the market for ready-to drink
9  juices because it has not figured out how to package ready to drink juices without
10 pasteurization or using high pressure pasteurization and it is against using plastic
11 bottles, (Dkt. No. 50-4, Orr Decl., Ex. 1, Seibold Depo. at 97:14-100:5.)  In reply, Pines
12 argues the question is not whether Pines has plans to enter the ready-to-drink beverage
13 but whether the consumer will think the product line expansion is likely citing to
14 McGregor-Doniger v. Drizzler Inc., 599 F.2d 1126, 1136 (2d Cir. 1991).

15          "Inasmuch as a trademark owner is afforded greater protection against competing
16 goods, a 'strong possibility' that either party may expand his business to compete with
17 the other will weigh in favor of finding that the present use is infringing."  Sleekcraft,
18 599 F.2d at 354 (citation omitted) (evidence shows that both parties are diversifying
19 their model lines and the potential that one or both of the parties will enter the other's
20 submarket with a competing model is strong).

21          Pines has not demonstrated a likelihood of expansion of its Mighty Greens into
22 the ready-to-drink market and it does not appear that Pines intends to expand its
23 products into the ready-to-drink market. (Dkt. No. 50-4, Orr Decl., Ex. 1, Seibold Depo.
24 at 97:14-100:5.)  Besides citing a Second Circuit case, Pines' argument that the standard
25 is whether consumers will think that product line expansion is not supported by any
26 evidence.  Therefore, this factor has not been met.

27          In carefully considering all the Sleekcraft factors, four factors, the strength of the
28 mark, similarity of the marks, degree of care likely to be exercised by the consumer, and

[16CV985-GPC(WVG)]

1  likelihood of expansion of the product lines, weigh in favor of Suja while three factors,
2  proximity of the goods, Suja's intent in selecting the mark and marketing channels used,
3  support Pines.  Thus, the Court concludes that Defendant has not demonstrated a
4  likelihood of success on the merits.

5  **B.    Irreparable Harm**

6        Pines argues that it will suffer irreparable harm if the requested injunction is not
7  granted because as a trademark owner, it is losing its ability to control its mark because
8  consumers will associate the quality of Suja's product with Pines, and it will lose its
9  ability to market its product with Suja's infringement because Suja is flooding the
10 marketing channels that Pines wants to use especially since Coca-Cola and Goldman
11 Sachs recently bought 49% of Suja.  Moreover, due to the entry of Suja's Mighty Greens
12 drink into the market place, Pines sales have dropped by 40% from 2014 to 2015 despite
13 its increase in advertising expenses. (Dkt. No. 37-1, Seibold Decl. ¶ 30.) Lastly, Suja's
14 association with Coca-Cola, which represent "high-fructose corn syrup, non-organic,
15 non-sustainable, GMO, plastic using American food culture" could have a devastating
16 effect on Pines' reputation of a "commitment to the planet, organic farming, sustainable
17 agriculture, environmental preservation and non-GMO natural superfoods." (Dkt. No.
18 37 at 36-37.)

19       Suja contends that Defendant has not presented evidence that it will suffer
20 irreparable harm.  Instead, Defendant will not suffer irreparable harm because it did not
21 file a motion for preliminary injunction until fourteen months after Pines' CEO knew
22 about Suja's use of the name Mighty Greens which was as early as May 3, 2015.
23 Second, Pines offers no evidence of harm of "loss of control of a business reputation,
24 a loss of trade and loss of goodwill."  Next, Pines has not shown that the drop in sales
25 from 2014 to 2015 was attributable to the entry of Suja's Mighty Greens juice, but the
26 sales history of Mighty Greens reveal that a drop in sales was not unusual.

27       A moving party must demonstrate irreparable injury is likely in the absence of an
28 injunction.  Winter, 555 U.S. at 20.  A party seeking injunctive relief for trademark

infringement must provide "evidence sufficient to establish likelihood of irreparable harm." Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc., 736 F.3d 1239, 1251 (9th Cir. 2013); Active Sports Lifestyle USA, LLC v. Old Navy, LLC, No. SACV 12-572-JVS(Ex), 2014 WL 1246497, at *2 (C.D. Cal. Mar. 21, 2014) (trademark infringement, itself, does not constitute irreparable harm and the existence of intangible harms such as loss of goodwill must be shown by evidence).

The moving party must also show that the harm is not only irreparable but must demonstrate immediate threatened injury. Carribean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988); Fed. R. Civ. P. 65(b)(1)(A) (plaintiff must show it faces both "immediate and irreparable injury"). A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." Garcia v. Google, Inc., 743 F.3d 1258, (9th Cir. 2014) (quoting Oakland Tribune, Inc. v. Chronicle Publ'g, 762 F.2d 1374, 1377 (9th Cir. 1985)); see also Miller v.. Cal. Pac. Med. Ctr., 991 F.2d 536, 544 (9th Cir. 1993) (noting that delay in seeking injunctive relief "implies a lack of urgency and irreparable harm.") While Plaintiff's delay is not alone decisive in determining whether he will be irreparably harmed, it is still "weighs against the immediacy of the harm." AK Metals, LLC v. Norman Indus. Materials, Inc., No. 12cv2595-IEG(WGV), 2013 WL 417323, at *10 (S.D. Cal. Jan. 31, 2013) (two-month delay).

Suja's argument that the delay in filing the motion for preliminary injunction weighs against irreparable harm is not persuasive. Pines' CEO learned about Suja's use of "Mighty Greens" around May 3, 2015 and sent a cease and desist letter on May 29, 2015. (Dkt. No. 59-3, Seibold Decl. ¶¶ 2, 3.) In a letter dated June 3, 2015, Suja refused to cease using Mighty Greens and instead offered a co-existence agreement. (Id. ¶ 6.) On July 8, 2015, Pines responded to Suja and declined their offer of a co-existence and again requested that Suja cease and desist. (Id. ¶ 7.) On July 23, 2015, Suja responded and offered to change its name to "Mighty Green" removing the "s" but that was not acceptable to Pines. (Id. ¶ 8.) After playing phone tag, Pines contacted Suja by phone on September 29, 2015 and offered Suja a 90 day period to phase out its

1  Mighty Greens product.  (Id. ¶ 9.)  In early 2016, when Suja did not discontinue its use

2  of the infringing mark, Pines gave Suja one final chance and on April 4, 2016, Pines

3  wrote to Suja demanding that it promptly phase out use of Mighty Greens or it would

4  file a lawsuit if Suja did not agree.  (Id. ¶ 12.)  A couple of weeks later, Suja filed the

5  instant action on April 22, 2016.  (Id. ¶ 13.)  When Pines' counsel was hired on May 19,

6  2016, he contacted Suja's counsel and began discussing settlement options.  (Dkt. No.

7  59-1, McArthur Decl. ¶ 2.)

8         In early June 2016, both parties exchanged settlement communications and agreed

9  to a two-week delay to explore possibility of settlement.  (Dkt. No. 50-3, Orr Decl. ¶ 2.)

10  On June 24, 2016, Suja filed its answer and counterclaim.  (Dkt. No. 13.)  On July 9,

11  2016, Pines filed its motion for preliminary injunction which was later withdrawn and

12  refiled on August 8, 2016.  (Dkt. Nos. 15, 36, 37.)

13         The delay in filing the motion for preliminary injunction was due to good faith

14  discussions and negotiations regarding settlement between the parties.  Accordingly, the

15  delay does not weigh against a finding of irreparable harm.  See E&J Gallo Winery v.

16  Gallo Cattle Co., No. CV-F-86-183 REC, 1989 WL 159628, at *30 (E.D. Cal. June 19,

17  1989) ("Delay in commencement of suit to accommodate settlement negotiations does

18  not constitute laches.") (citing Earth Technology Corp. v. Environmental Research &

19  Tech., Inc., 222 U.S.P.Q. 585, 586–587 (C.D. Cal. 1983)); Perfect 10, Inc. v. Cybernet

20  Ventures, Inc., 213 F. Supp. 2d 1146, 1190 (C.D. Cal. 2002) (nine month delay due to

21  need of discovery and stream of motions between filing of complaint and filing of

22  motion for preliminary injunction not sufficient to raise laches bar on motion for

23  preliminary injunction).

24         Next, Pines' argument that a 40% drop in sales of Mighty Greens from 2014 to

25  2015 due to Suja's entry into the market is not supported by the record.  The sales

26  history of Mighty Greens has  fluctuated widely from year to year.  (Dkt. No. 54-2, Orr

27  Decl. Ex. 2 (UNDER SEAL).)

28  ████████████████████████████████████████████████████████████

[16CV985-GPC(WVG)]

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ███████████████████████ (Id.)  Therefore, the drop in sales of Mighty Greens from 2014

4 to 2015 can be attributable to the fluctuations in the market and not necessarily from the

5 entry of Suja's Mighty Greens into the marketplace.  Moreover, Seibold stated that

6 "[o]ver the past two years, there has been a huge upsurge in customer attention to

7 superfoods and the market has grown exponentially."  (Dkt. No. 37-1, Seibold Decl. ¶

8 32.)  Therefore, a drop in sales can also be attributed to the growth of the superfoods

9 market.  In addition, any alleged loss of sales does not constitute irreparable harm

10 because it can be remedied by money damages.  See Aurora World, Inc. v. Ty Inc., 719

11 F. Supp. 2d 1115, 1169 (C.D. Cal. 2009) ("Loss of sales alone will not support a finding

12 of irreparable injury 'because acceptance of that position would require a finding of

13 irreparable harm to every plaintiff regardless of circumstances.") (citing Reebok Intern.

14 Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1557 (Fed. Cir. 1994)).

15     Lastly, Pines argument that it will lose control of its goodwill and reputation due

16 to its customers associating Pines and Coca-Cola, which owns Suja, is not supported by

17 any evidence.  The Ninth Circuit recognized that "[e]vidence of loss of control over

18 business reputation and damage to goodwill could constitute irreparable harm."  Herb

19 Reed Enters., 736 F.3d at 1250.  However, such harm must be established by evidence

20 to show irreparable injury is likely and that money damages are inadequate and not by

21 "platitudes" or evidence that merely "underscores customer confusion." Id.  Reversing

22 the district court's findings, the Ninth Circuit concluded there was no evidence of

23 irreparable harm based on unsupported and conclusory statements regarding harm the

24 plaintiff might suffer.  Id. at 1250-51.  In this case, Pines has not provided evidence of

25 any loss of goodwill or reputation based on Suja's Mighty Greens entry into the

26 marketplace or its customers are associating Pines with Coca-Cola.  Thus, the Court

27 concludes that Pines has not demonstrated irreparable harm.

28     Because Pines has failed to demonstrate likelihood of success on the merits and

1  irreparable harm, the Court need not decide the remaining two factors of the balance of

2  equities and the public interest.  See Herb Reed Enters., 736 F.3d at 1251.

3  **Conclusion**

4      Based on the above, the Court DENIES Defendant's motion for preliminary

5  injunction.

6      IT IS SO ORDERED.

7

8  DATED:  October 24, 2016

9

10                                          HON. GONZALO P. CURIEL
                                            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[16CV985-GPC(WVG)]